IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA,
GAINESVILLE DIVISION

JACKI PICK

      Plaintiff,

vs.

BRADFORD JAY
RAFFENSPERGER,

      Defendant.

CASE NO. 1:24-cv-01607-AT

JURY TRIAL DEMANDED

## ORIGINAL COMPLAINT

Jacki Pick sues Bradford Jay Raffensperger in his personal capacity for civil libel, defamation including defamation per se, libel, libel per quod, libel by innuendo in light of extrinsic facts, false light, and intentional infliction of emotional distress or, alternatively, negligent infliction of emotional distress based on statements in his book, ironically titled "Integrity Counts."

## INTRODUCTION

1.    The conduct of free and fair elections in the United States relies on the service of Americans who work to ensure that the rule of law is followed. Whether serving in professional or volunteer capacities, concerned citizens throughout American history have risen to the challenge of securing the franchise.

2.    The 2020 presidential election was the most contested in modern history. The conduct of state officials charged with securing the election—particularly in swing

28267790v1 97410.002.00

states—came under intense scrutiny. Failure to secure an election could arguably be career-ending. Therefore, state officials had incentive to vigorously deflect all accusations and unwanted attention—and divert attention onto others.

3.    Mr. Raffensperger did exactly that to Ms. Pick. He publicly and falsely accused her of presenting misleading evidence to the Georgia state legislature. Specifically, he alleged she was one of a team of lawyers that presented a surveillance video ("Video") to the Georgia legislature showing ballot counting at State Farm Arena on November 3, 2020 that was "doctored," "chopped up," "cut," "sliced up," and "deceptively sliced and edited so that it appeared to show the exact opposite of reality," allegedly including a "slice of video that had removed the clear evidence" that the law had been followed. (Integrity Counts, p. 138, 139, 143, 144, 146).[1]  Raffensperger claimed his team had to "punch down lies" about the "sliced up video." (p. 146).

4.    The truth is that Ms. Pick presented authentic, uncut, unedited video footage to the legislature. The Video was a single file spanning more than 20 hours - not "doctored," "edited," "chopped up," "sliced," "diced," or "spliced," video, and it had no "slice" or segment removed.

5.    Mr. Raffensperger later changed his story. When put under oath or penalty of prosecution for false statement, he backed off of the litany of "edited" synonyms and

---

[1] *See also*, Interview with the Select Committee to Investigate the January 6 Attack on the United States Capitol, (Nov. 30, 2021)(Statement of Brad Raffensperger).

28267790v1 97410.002.00

instead alleged that the Video was simply shown "out of sequence" or that only part of the Video had been shown.  Mr. Raffensperger knew full well that the Video was greater than twenty hours long and that to show the entire Video would have been impractical in a legislative hearing, mostly irrelevant, and absurd. Where Ms. Pick requested that the Video be rewound or fast-forwarded to various timeframes, she says so explicitly in her testimony, and the time change is obvious from the daylight or absence of daylight in a room that was mostly windows.

6.    Mr. Raffensperger had a motive for his attacks on Ms. Pick. The Video proved—*unbeknownst to Ms. Pick at the time*—that Mr. Raffensperger had twice made false written statements to the legislature about election night events at State Farm Arena and had spent weeks lying to the legislature about exactly the contents of the Video.  But for the release of the Video, Raffensperger's cover up might never have been made known publicly and would never have come out in a subsequent legislative hearing. Knowingly making a false statement or presenting false evidence to the legislature is a crime - the same crime about which he falsely maligned Ms. Pick.

7.    Mr. Raffensperger's attack on Ms. Pick was both a deflection of and diversion from his own incompetence or malfeasance in the form of a "decoy process" (the use of an irrelevant fact to draw attention from a dispositive fact).

8.     Specifically, Mr. Raffensperger claimed to "debunk" Ms. Pick by tackling a straw man of his own making: that she failed to show a section of the video of election workers placing ballots under the table in the presence of election observers.

9.     The problem with this narrative: this is a "debunking" of a claim that Ms. Pick never made. At no time did she claim ballots went under the table outside the presence of election observers.[2]

10.    Mr. Raffensperger changed the narrative to a red herring to divert attention from his false statements and from Ms. Pick's actual presentation content: that election officials made an announcement that ballot counting would stop at State Farm Arena for the night and would resume the next morning, and that observers left the Arena under this impression - which turned out to not be true.

11.    Ms. Pick's presentation was based on a good faith belief that more than one election irregularity could or did occur, specifically:

    a. violation of the Georgia laws requiring notice of "proceedings" / ballot counting and

    b. violation of the law that ballot counting "shall" be open to public view, requiring:

---

[2] Mollie Hemingway, *No, The Georgia Vote-Counting Video Was Not "Debunked," Not Even Close.* The Federalist, (Dec. 7, 2020). https://thefederalist.com/2020/12/07/no-the-georgia-vote-counting-video-was-not-debunked-not-even-close/

    i.  that officials give observers the opportunity to be present, and

    ii.  that ballot processing be visible to the observers rather than ballot containers being obscured and shuffled in a possible shell game under a table cloth.

12.    Mr. Raffensperger also falsely accused Ms. Pick of sensationalizing or lying about the events at State Farm Arena by using the term "suitcase" to describe ballot containers. But Mr. Raffensperger would have had knowledge that "suitcase" is field jargon commonly used by Fulton County election workers.

    a.  The election monitor at State Farm Arena used the term "suitcase" to describe the containers weeks before Ms. Pick's presentation in his firm's November 13, 2020 report to the State Election Board—on which Raffensperger sat ex-officio.[3]   Mr. Raffensperger describes receiving a detailed briefing on this very report.

    b.  Mr. Raffensperger is the chief elections officer for the state who has run for office in Fulton County multiple times, so he would be familiar with their elections terms.

---

[3] Link to monitor's report available at John Solomon, Georgia Investigator's Election Day Notes Reveal Massive Election Integrity Problems in Atlanta, JustTheNews, (June 19, 2021), *https://justthenews.com/politics-policy/elections/ga-investigators-election-day-notes-reveal-chaotic-unsecured-ballot*

28267790v1 97410.002.00

c. Further, *multiple election workers* used the term "suitcase" as field jargon to describe ballot containers *more than thirty-five times* across multiple declarations of facts served on Mr. Raffensperger in the 2020 election contest lawsuit. Ms. Pick learned the term "suitcase" from having reviewed and organized those declarations of facts multiple times before her Georgia legislature testimony.

13.   Mr. Raffensperger could simply have stated that he disagreed with the contents of Ms. Pick's presentation. Instead, he chose to accuse her of dishonesty and crime, over and over again. Mr. Raffensperger's false accusations, repeated aspersions, extreme language, and "hand waiving" with motives to cover his own actions demonstrate ill will, spite, hatred, and an intent to discredit, injuring Ms. Pick's reputation. The defendant's words demonstrate express common law malice and were published with actual malice.

## A SECRETARY OF STATE UNDER SIEGE

14.   Georgia Secretary of State Raffensperger was under siege from the earliest moments of his term. He received scathing criticism from Georgia citizens, voting rights groups, leaders of both political parties, and local and national media for incompetence or alleged voter suppression, most notably in the 2020 primary election. Criticism included voter suppression in the black community.

28267790v1 97410.002.00

15.    Mr. Raffensperger gives a detailed account of these and other disparagements—including calls for his resignation—in his book, Integrity Counts, (the Book) which he publicly admits he wrote to support his re-election. Georgia's paper of record led off:

> The Wednesday [after the 2020 primary election day] morning all-caps headline on the front page of the *Atlanta Journal Constitution* screamed, "COMPLETE MELTDOWN." Once again, we heard cries of 'voter suppression!' ...the media said the...secretary of state's office created the meltdown in Fulton..." (Integrity Counts, p. 88-89).

16.    Voting rights advocates filed lawsuits, including one calling Mr. Raffensperger "Georgia's chief architect of voting barriers." (p. 70).

17.    Mr. Raffensperger assumed a strongly defensive posture heading into the 2020 General Election. The day after the election, he noted that he was in the national spotlight and metaphorical hot seat writing that "every show announced on its screen something like, *Breaking News: All Eyes on Georgia. Secretary of State on Ballot Count and What's Next*." (Book, p. 100). The last thing he needed was further embarrassment or humiliation by the press if evidence came to light showing his failure to secure and properly administer Georgia's elections.

18.    After more embarrassments in the general election, officials including Georgia's U.S. Senators Loeffler and Perdue called for Mr. Raffensperger's resignation. (Book, p. 10).

19.    Following the 2020 election, the Georgia authorities humiliatingly moved to oust Mr. Raffensperger from the State Election Board and created a legal mechanism for state takeover of Fulton Co. elections.

20.    Mr. Raffensperger attempts to excuse these failings in his Book, published in November 2021 in advance of his then-upcoming 2022 primary election, by scapegoating others.

21.    Mr. Raffensperger has blamed and relentlessly assailed Fulton County election workers and officials:

- "I often call out Fulton County whose mismanagement issues are documented …because of their refusal to address the logistical issues they seem to have every election cycle. It is commonly understood that if something is going to go wrong during an election in Georgia, it's going to happen in Fulton County. Their mismanagement breeds distrust…" (p. 89). "…the volume of Fulton's issues was unique – up to 80% of the complaints we received in Georgia were concerning Fulton County." (p. 90). (For context, there are 159 counties in the state of Georgia).

- "In the wake of the primary election problems, the State Election Board investigated … Fulton County …. Our investigation led to a consent order between the county and the State Election Board requiring Fulton to engage an independent elections expert to monitor [the state-imposed monitor or "state monitor"] the general election process… finally held Fulton County accountable for its mismanagement and disorganization…" (p. 91).

- He notes that while almost all of Georgia's 159 counties successfully processed absentee ballot requests, Fulton County, "fell behind and never caught up." (p. 84).

22.    Mr. Raffensperger blamed the Fulton County Elections Director, Richard Barron: "*I again called for the termination of the Fulton County Elections Director.*" (p. 91).

23.    Mr. Raffensperger blamed Fulton County's Democrat leadership: "*This issue [mismanagement] is in the complete control of Fulton County's Democratic leadership.*" (p. 89). He later called Fulton County's actions "*malfeasance*":

> "*After 20 years of documented failure in Fulton County elections, Georgians are tired of waiting to see what the next embarrassing revelation will be,*" said Raffensperger. "*The Department of Justice needs to take a long look at what Fulton County is doing and how their leadership disenfranchises Fulton voters through incompetence and malfeasance. The voters of Georgia are sick of Fulton County's failures.*"[4]

24.    Mr. Raffensperger blamed the Elections Supervisor who was the senior election staff member seen in the State Farm Arena Video on election night, November 3, 2020, and called for his firing:

> a.   "*Fulton County's continued failures have gone on long enough with no accountability. Rick Barron and Ralph Jones, Fulton's registration chief, must be fired and removed from Fulton's elections leadership immediately.*

---

[4] https://sos.ga.gov/news/secretary-raffensperger-calls-department-justice-investigate-allegations-fulton-county  (October 11, 2021)

28267790v1 97410.002.00

*Fulton's voters and the people of Georgia deserve better,*" Raffensperger tweeted.[5]

25.    Mr. Raffensperger blamed the Heritage Foundation, the Republican National Committee, the American Civil Rights Union, and Judicial Watch for the disastrous 2020 consent decree / settlement agreement he agreed to - for which he took unmitigated criticism - because they *"didn't see the value of defending [election integrity]*," (p. 69) giving him the "*cold shoulder*" and insuring him that "*there would be no conservative cavalry riding in to help us match the resources of the liberal litigation machine.*" (p. 69, 75-76).

26.    Along with everyone else named above, Mr. Raffensperger blamed and defamed Ms. Pick by publishing statements that falsely accused her of being part of a team that presented "*deceptively sliced and edited*" video footage and "*lying*" in testimony before the Georgia state legislature. (p. 138, 139, 150).

### JURISDICTION, PARTIES, AND VENUE

27.    Plaintiff Jacki Pick is a Texas citizen and resides in Dallas, Texas.

28.    Ms. Pick served many years on Capitol Hill as legal counsel to the Chairman of the U.S. House Subcommittee on the Constitution and the former Ranking Member of

---

[5] Kristine Phillips, *Georgia's Raffensperger Calls for Firing of Fulton County Election Officials,* USA Today (July 15, 2021) https://www.usatoday.com/story/news/politics/2021/07/15/georgias-raffensperger-calls-firing-fulton-election-officials/7983338002/

28267790v1 97410.002.00

the U.S. House Commercial and Administrative Law Subcommittee.  In these capacities, she advised on the oversight of federal agencies and her portfolio of issues included voting rights.  She hosts an educational podcast on multiple media platforms. She has devoted her professional and civic life to upholding and defending the U.S. Constitution.  She loves her country, and she volunteered after election 2020 to defend America's rule of law and its free and fair elections, as she has done in elections dating back to 1994.  She has spent a lifetime building her personal and professional reputation, starting beneath the poverty line in Appalachia and becoming the first in her family to graduate from college, eventually graduating from a top twenty law school and become a nationally known professional.

29.    Defendant Bradford Raffensperger is a Georgia citizen and resides in Johns Creek, Georgia. He is sued in his individual capacity as the author of Integrity Counts. This Court has personal jurisdiction over him because he is a Georgia resident. Additionally, he entered contracts to have his book, Integrity Counts, marketed and sold to Georgians through online booksellers and physical stores located in Georgia. He also promoted Integrity Counts through Georgia media outlets that broadcast in the Georgia market and nationally.

30.    Subject matter jurisdiction exists under 28 U.S.C. §1332 because there is complete diversity among the parties and the amount in controversy exceeds $75,000.00.

28267790v1 97410.002.00

31.   Venue is proper in this district and division under 28 U.S.C. § 1392(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred here, including one or more of the books were sold in this district and division.

32.   Maintenance of this suit is proper under Georgia Code § 9-2-61 (2020) because Ms. Pick filed this suit within six months after the United States District Court for the Northern District Court of Texas on October 17, 2023, dismissed without prejudice her claims against Mr. Raffensperger for lack of personal jurisdiction - not on the merits.

33.   Ms. Pick demanded Mr. Raffensperger to retract his defamatory statements pursuant to Georgia Code § 9-2-61 (2022) and satisfied conditions precedent to the filing of this lawsuit.  At the time of filing, Mr. Raffensperger has neither published a retraction, refutation, or apology, nor taken steps to remove the Book from the market.

## GEORGIA LAW AND ELECTION NIGHT 2020

34.   Georgia Code § 21-2-522(1) (2020) states the result of an election may be contested on the grounds of "[m]isconduct, fraud, or irregularity by any ... election official or officials sufficient to change or place in doubt the result." "Whenever the court trying a contest shall determine that the primary, election, or runoff is so defective as to the nomination, office, or eligibility in contest as to place in doubt the result of the entire primary, election, or runoff for such nomination, office, or eligibility," the court "declare[s] the primary, election, or runoff to be invalid . . . and

shall call for a second primary, election, or runoff to be conducted among all of the same candidates. " Georgia Code § 21-2-527.

35.     Restated, an election may be contested with or without fraud, on irregularity grounds alone, or on the basis of misconduct.

36.     Further, Georgia Code § 21-2-483(b) (2020) states that "[a]ll proceedings" at tabulation centers "shall be open to the view of the public." Georgia law requires that returns "be open to public inspection at the office of the superintendent as soon as they are received from the chief managers."   Georgia Code § 21-2-491.   Furthermore, Georgia Code § 21-2-492 (2020) required that the superintendent give "at least one week's notice prior to the primary or election by publishing same in a conspicuous place in the superintendent's office, of the time and place when and where he or she will commence and hold his or her sessions for the computation and canvassing of the returns. "

37.     In short, Georgia law requires officials to provide (a) access to members of the public, the press, and observers, to be present when votes are counted and (b) notice of when ballots will be counted.

38.     Witness affidavits and press reports provide information about election night, Nov. 3, 2020, at Fulton County's State Farm Arena: a person who appeared to be an election official announced to the room of election workers, press, and partisan observers at approximately 10:00 p.m. and that counting at State Farm Arena would

28267790v1 97410.002.00

stop at 10:30 p.m. and begin again the next morning at 8:30 a.m.  A second official,

the Fulton County Public Affairs Manager, confirmed this understanding with the

press and at least one partisan observer.

39.    Multiple contemporaneous press accounts confirm this announcement.    For

example, ABC News (November 3, 2020, 10:34 p.m.):



**ABC News Politics** ✔
@ABCPolitics

**NEW: The election department sent the ballot counters at the State Farm Arena in Atlanta home at 10:30 p.m., Regina Waller, the Fulton County public affairs manager for elections, tells ABC News.**

And    The    Atlanta    Journal-Constitution    (November    3,    2020)

(https://www.ajc.com/news/atlanta-news/fulton-election-results-delayed-after-pipe-

bursts-in-room-with-b%20allots/4T3KPQV7PBEX3JVAIGJBNBSVJY/)

They planned to stop scanning absentee ballots at 10:30 p.m. and pick it up back in the morning. No official could explain before press time why Fulton was stopping its count of absentee ballots at that time, only saying that was the procedure.

28267790v1 97410.002.00

40.    Two election observers from the Republican Party of Georgia were present at State Farm Arena on election night.  Their accounts, memorialized in affidavits, also aver that they heard the announcement that counting would cease at 10:30 p.m. and resume at 8:30 a.m. on November 4.    True and correct copies of affidavits from election observers Mitchell Harrison and Michelle Branton are attached as Exhibits A and B. The individual who made the announcement to the observers appeared to be an election supervisor.

41.    Election Observer 1, Mitchell Harrison (Affidavit Attached as Exhibit A):

> **there.   Trevin and I thought that was odd because at 10:30 P.M., Regina Waller and the supervisor lady had said they were done counting for the night, and would not resume until 8:30 A.M. the next morning.**

42.    Georgia law does not permit observers to remain in ballot counting facilities outside of times for "proceedings" such as  when ballots are not being processed. The partisan election observers and press left State Farm Arena after the announcements that vote tabulation (proceedings) would cease at 10:30 p.m.

43.    One or both of the affiant election observers aver that: they were the last to leave the public observation area; they made three separate requests for a standing vote count before they left; election officials did not provide them with a count; despite the announcement that counting was done for the evening, one of them later learned that counting had resumed at State Farm Arena; when the one of the observers learned

about this, he, along with a second witness, returned to State Farm Arena after 1:00 a.m. Security personnel confirmed that a few individuals remained after 10:30 p.m. and continued working up until just minutes before the observers returned.

44.   Video surveillance evidence later confirmed that ballot counting resumed around 11:03 p.m. and ended again around 1:00 a.m. Ms. Pick found no information to show that officials provided proper notice of the restarting of the count such that observers or members of the press could be present to observe those late-night and early-morning proceedings.

### MS. PICK'S LIMITED INVOLVEMENT IN THE ELECTION CONTEST

45.   Ms. Pick has devoted hundreds of hours of work, volunteerism, and study to voting rights and election law.

46.   Shortly after the 2020 election, Ms. Pick volunteered to assist with election related matters in Georgia. She helped organize and summarize investigative facts and affidavits from approximately one hundred witnesses who believed they saw potential or actual irregularities, misconduct, or fraud in the administration of the November 3, 2020, election. At least two of those affidavits concerned perceived irregularities in ballot processing at State Farm Arena on November 3 and November 4, 2020.

47.   On information and belief, during the afternoon or evening of December 2, 2020, the legal team litigating the Presidential election contest, obtained raw, uncut, unedited video footage of the vote processing and tabulation at State Farm Arena on

November 3 and November 4, 2020, ("Video").  Ms. Pick was doing her volunteer

work at the law office.

48.     Upon information and belief, the video file spanned between twenty-plus hours

and took numerous hours to download. Thus, the video did not become available to view

until around 1:00 a.m.

49.     The twenty-plus hours of State Farm Video footage appeared to verify the

affiant election observers' claims.  While the Video did not include sound, it showed

what appeared to be an election official near observers around 10:00 p.m.; press,

election observers, and most workers leaving around 10:30 p.m.; four to six officials

or workers (including the person who made the announcement to the observers)

staying behind after the others left; and the remaining persons tabulating ballots from

approximately 11:03 p.m. until sometime around 1:00 a.m.

50.     Neither observers nor press appear present during this timeframe even though

Georgia law gives the public the right to be present.

51.     The absence of press is notable because Georgia—a swing state whose votes

had not yet fully been reported—was the focus of intense media interest at precisely

this time.

52.     At approximately 11:52 p.m., an election monitor (whose presence was

mandated in Fulton County because of what Mr. Raffensperger describes as prior

incompetence and malfeasance) arrived.   The Video appears to show the monitor

28267790v1 97410.002.00

agitated. He began taking photos of the computer screens in the scanner area and then placed a phone call.  Minutes later at 12:15 a.m., the Secretary of State's Deputy Chief Investigative Officer arrived and had a conversation with the monitor.

53.     Only twelve hours after the law firm viewed the video, the Georgia State Senate Election Law Subcommittee held a hearing at 1:00 p.m. on Dec. 3, 2020 to learn about alleged election irregularities, misconduct, or fraud in the 2020 election.   Despite not having had enough time to view the entirety of the Video footage, which spanned more than twenty-hours, Ms. Pick and others determined that the *relevant* portions of the Video matched the events with referenced timeframes in the press and affiants' reports of irregularities.

54.     Approximately two hours before the hearing, it was determined that Ms. Pick would attend the hearing because she had reviewed the witness affidavits that corroborated various points in the raw surveillance footage.  She matched the video to the witness affidavits that were to be attached to the complaint supporting the presidential election contest as exhibits.

55.     While Ms. Pick is an attorney, she was not counsel for the Trump legal team. She stressed at the beginning of her testimony that she was appearing as a volunteer and not as a lawyer.

56.     The Video presented to the legislature was  uncut, unedited, and had no part deleted or removed.  The full video was in the hearing room and available to the

Committee to review or request to review. Ms. Pick did not play "snippets" of a video that were "spliced" together, but instead was fast-forwarding and rewinding on a single, hours-long, video file. She is heard on the hearing Video instructing the A/V tech multiple times to "fast-forward" or "back up" to various times on the single video file, as is obvious from either the video of the public hearing or the transcript of her presentation.

57.    Upon information and belief, the full Video became public shortly afterward.

58.    The hearing video of the December 3, 2020, hearing is publicly available at https://www.youtube.com/watch?v=hRCXUNOwOjw.

59.    At one point in her presentation, Ms. Pick pointed to the ballot containers on the screen and said, "*I am going to call these suitcases.*"

60.    In the days leading up to her testimony, Ms. Pick reviewed and summarized dozens of affidavits regarding potential election irregularities. The word "suitcase" is used to describe ballot containers in no less than four affidavits signed by election workers, and no less than thirty different times. From this, Ms. Pick believed this is the commonly used term for these containers. Indeed, the containers look like suitcases. Below is a sampling of content from various affidavits that Ms. Pick reviewed while volunteering:

- **Affidavit of Election Worker 1:**

    paragraph 23: "During the process, these ballots were eventually gathered in ***suitcases (ballot cases)*** and collected

into the corner of the facility."[6]

- **Affidavit of Election Worker 2**:

    paragraph 8: "The ***ballots were contained in what appeared to be suitcases*** with zip ties in what did not appear to be a very secure area."

    paragraph 13: "The number of ballots stated to be in the ***suitcase*** was 3,161, and the numbers recorded were 75 Trump, 2,109 Biden...]...

    paragraph 15: "The number of ballots stated to be in the ***suitcase*** were 105 Trump, 3,311 Biden..."[7]

- **Affidavit of Election Worker 3**:

    Under the bold-faced subject heading "*No Chain of Custody for **Suitcases** of Ballots*," this affiant explains that ballots were not secured properly, and she *uses the term suitcase over 25 times*, including in the quote of a third person, another election worker. Below is just a sampling of excerpts from a very long affidavit:

    paragraph 11: "At tables 122, 98, 93, 76, 37, 24, 46, and 80, ***two suitcases*** were left on top of the audit table with no supervision."

    paragraph 12: "All the ***suitcases*** were intermingled – ***suitcases*** that had already been counted were placed with ***suitcases*** that had not been counted."

    paragraph 13: The ***suitcases*** were left next to the entrance/exits, which allowed easy access for anyone to take them."

    paragraph 15: "There was never any security around the ***suitcases***..."

---

[6] Affidavit attached as Exhibit C.

[7] Affidavit attached as Exhibit D.

paragraph 16:   "The *suitcases* were distinguished by serialized, color-coded 'intabs' that were easy to break. The colors were green, red, and orange. The serial numbers of the *suitcases* were not tracked."

paragraph 18: "The precinct and number of the ballots in the *suitcase* was written on a neon green piece of paper – similar to your name on a suitcase. 'Counters' were able to pull these papers out and it was easy to manipulate."

paragraph 48: Another election worker referred to the ballot containers as suitcases (quote) "*I heard a worker say* that "they are trying to determine if all of the *suitcases* have been counted."[8]

- Affidavit of Election Worker 4:

"I saw ballots being put into *suitcases* (ballot cases), but I do not know where they went from there."[9]

61.     Upon information and belief, Mr. Raffensperger had knowledge of the contents of these affidavits as he was the defendant in the 2020 election contest styled *Trump v. Raffensperger* to which the affidavits were attached as exhibits.   This knowledge that the term "suitcase" is field jargon and not incendiary constitutes actual malice as to Raffensperger's claim that Ms. Pick fabricated the term and concept. Mr. Raffensperger claimed repeatedly that his office ran down every lead or allegation. Upon information and belief, these would have included allegations in sworn affidavits.

---

[8] Affidavit attached as Exhibit E.
[9] Affidavit attached as Exhibit F.

62.     Below is a photo of the containers used in Fulton County, Georgia in the 2020 general election:



63.     Mr. Raffensperger often cites to the "state monitor" (Fulton County election monitor), Carter Jones of Seven Hills Strategies, but for some reason fails to point out that this monitor he relies on used the term "*suitcase*" to describe containers at State Farm Arena.  As the monitor explained in his November 2020 report to the State Board of Elections—on which Mr. Raffensperger sat—State Farm Arena on November 3, 2020, had:

> "*too many ballots coming in for secure black ballot boxes*," so they resorted to bringing ballots in "*rolling bins*" creating potentially a "*massive chain of custody problem.  It is my understanding that the ballots are supposed to be moved in numbered, sealed boxes to protect them.*"

Thus, these rolling bins may well have been a synonym for "suitcases," because Jones uses exactly that term in a different part of his report:

> Learn that Rick [Barron, the Fulton County Elections Director] reprogramming poll pads earlier was setting up a new precinct for SC 11 because someone took the wrong *suitcase*, *but took only one*. Seems to be a mystery who this person was – Should have chain of custody paperwork !! That means that a stranger just walked out with sensitive election materials?  Several *cases* (including SC11) were just left out on the loading dock outside the warehouse.

64.    Mr. Raffensperger admits being briefed on this state monitor's report, and admits the media widely circulated the report and its contents, and so he and even the public knew of its existence and content.  Specifically, he wrote:

> Soon after the November election, Carter Jones [the state monitor] prepared a formal report that was widely disseminated by the press, and he shared his findings and observations in separate briefings with secretary of state staff and myself, the State Election Board [(on which Mr. Raffensperger sat ex-officio at that time)],… (p. 91)

65.    This statement proves Mr. Raffensperger knew of this report and its contents. Yet, he seems to claim no knowledge that "suitcases" was election field jargon, repeatedly arguing that this is a deceptive term. This is flatly false and actual malice.

66.    Ms. Pick explained to the legislative panel that, as the firm had the ability to view the video only at 1:00 a.m. and the hearing was twelve hours later, there had been no

opportunity in those twelve hours to speak to Fulton County officials or others about the contents of the video.

67.    When Ms. Pick did not have the answer to a question, she let the panel know and properly qualified her testimony multiple times where appropriate. She further testified that there were unanswered questions that the firm would be able to answer with more time to review the full video footage.

68.    Ms. Pick never stated that the video proved on intent to commit voter fraud. Nor did she name election workers or allege that any particular individual committed a crime.

69.    As referenced in the statute above, no proof of fraud was necessary for the election contest and certainly not for Ms. Pick's testimony that aimed to raise questions and inform the public about a matter of great public concern.  Her testimony focused solely on questions and potential irregularities that anyone could observe from the video, matched to the claims made in witness affidavits.  Her observations were truthful and accurate based on the knowledge she had.

70.    During the presentation, Ms. Pick offered to show committee members more of the Video.  Someone within the hearing room—believed to be the hearing chairman—questioned whether members of the panel would like to see more of the Video and then declined Ms. Pick's offer.  At multiple points Ms. Pick invited and answered questions from Committee members.

71.    Ms. Pick was the only witness to present the Video before the Committee.

72.    Ms. Pick's statements were factually correct and corroborated by multiple press accounts from Nov. 3-4, 2020, multiple witness affidavits, the report of the state's own Fulton County election monitor, and the Video which speaks for itself.

## MR. RAFFENSPERGER DEFAMES MS. PICK

73.    Mr. Raffensperger later wrote Integrity Counts, distributed by Simon & Schuster in Ms. Pick's home state of Texas, Georgia, and nationally.

74.    Contracts and public statements show that Mr. Raffensperger spent over $50,000.00 of his private corporations' funds paying a ghostwriter to write his book and another $50,000.00 to pay a national public relations firm to promote the Book to aid his re-election and to build his brand nationally.

75.    Unfortunately for Ms. Pick, these firms did a tremendous job marketing the defamatory book, landing book promotion in almost all major media outlets with tens of millions of viewers and listeners.

76.    The news hook earned Mr. Raffensperger tens of millions of media impressions.

77.    Despite top shelf promotion, the book was a flop, selling around 2,000 copies according to the publisher.

78.    Despite the book's failure, the small audience who did read the book was the most damaging audience possible for Ms. Pick:  top name journalists and government

investigative authorities who foreseeably and understandably relied on the contents of the Book.

79.    The largest media outlets reported on the book, with some repeating exactly the false claims that defame Ms. Pick, naming her by name and augmenting the defamation.  It is predictable that the most sensationalized elements of a book get the most attention.

80.    It is also clear from public statements, official transcripts, and court filings that those investigating alleged election-related crimes read, and unfortunately, foreseeably and understandably, relied on statements in the Book.

### RAFFENSPERGER FLIP-FLOPS

81.    Mr. Raffensperger changes his story every time he comments on the part of his Book defaming Ms. Pick.  A clear pattern emerges.  Initially, the story grew each time Raffensperger or his surrogates told it, like the proverbial "size of the fish I caught" story. Once placed under oath, however, and once sued, Raffensperger changed his story, which underwent immediate and impressive shrinkage. Below is a summary of the evolution of his public statements over time:

82.    In the Book, in a chapter titled *"Sixty Days of Disinformation,"* Mr. Raffensperger refers to the Video Ms. Pick presented to the Committee with an all-caps subject heading describing it as *"SLICED-AND-DICED VIDEO."*

83.     He states that the State Farm Arena Video—"had been **deceptively sliced and edited so that it appeared to show the exact opposite of reality**." Book, p. 138 (emphasis added).  That is, he falsely accused Ms. Pick of presenting misleading and false evidence to the Georgia legislature—actions constituting a crime under Georgia law. Mr. Raffensperger published this statement on November 2, 2021, knowing that a criminal investigation was in the works to investigate precisely such a crime.

84.     Mr. Raffensperger went further in the book, claiming that the "**chopped up**" "**sliced and diced**" Video Ms. Pick presented included "**a slice of video** that had **removed the clear evidence** that Fulton County election workers had protected the ballots and the process as required by law." (p. 139). But Mr. Raffensperger does not identify the missing segment timestamps. They don't exist.  Ms. Pick referenced a full, untouched, surveillance Video spanning greater than twenty hours.

85.     Mr. Raffensperger goes on to write that his office and surrogates had to "**punch down lies**" or "**outright lying**" to correct Ms. Pick's description of "**official boxes**" containing ballots as "**suitcases**" or "**secret suitcases**." (p. 138, 144, 146).

86.     He then adopts and republishes the statement of a journalist who wrote that someone who would use the term suitcase to describe the ballot containers lives "**in a world outside of reason and reality**." (p. 144).

28267790v1 97410.002.00

87.    Mr. Raffensperger went on Morning Joe (MSNBC) to promote his Book. When the host asked him about the "conspiracy theory" about "suitcases," Mr. Raffensperger referred to the Video contents as "*the lie that got round the world*!"

88.    Subsequently, in later public statements, Mr. Raffensperger changed his story and dialed back these statements, more than once, particularly when under oath, such that criminal penalties could apply to his statement, if false.

89.    Mr. Raffensperger participated in a December 2021 interview with the United States House Select Committee to Investigate the January 6 Attack on the United States Capitol.   Though Mr. Raffensperger was not under oath in this interview, committee staff reminded him that he could be prosecuted for making a false statement, nonetheless.

90.    Mr. Raffensperger described the Video shown by Ms. Pick as "*sliced and diced*" with "*portions out of sequence*." (Transcript, p. 50, line 2). The committee staff asked him directly if he personally reviewed the tape. He answered, "No.  I just – portions of it. I haven't watched the whole, you know, 24 hour run of that, but law enforcement has." (p. 50, lines 19-22).

91.    When the committee staffer asked what Mr. Raffensperger meant by "sliced and diced," he responded, "...they took the video out of sequence, so then it looked as if they were actually, you know, pulling ballots out of the table, hidden ballots.  But they

weren't hidden ballots; they were ballots just put there minutes earlier." (p. 51, lines 20-25).

92.     The staff asked, "And when you say, 'sliced and diced' does that just mean... showed video of them taking the boxes out but didn't show video of them putting it in?" Mr. Raffensperger responded, "Exactly. Exactly. It ended up that people got the wrong impression that something illegal had happened." (p. 52, lines 4-7).   The January 6 Committee refers repeatedly to Integrity Counts, proving that it informed their investigation. (p. 77, lines 16-25).

93.     However, as a panelist at South by Southwest in Austin, Texas, Mr. Raffensperger changed his story yet again – after having been sued for defamation for his statements in his book.   During a question-and-answer session, an audience member asked about the investigation of the State Farm Arena allegations.   Mr. Raffensperger this time said *Rudy Giuliani* played "***selected portions***" of the Video. (South by Southwest Conference, Austin, TX, March 12, 2023).

94.     In sum, Mr. Raffensperger's story about the Video changes repeatedly over time from the book claiming a "deceptively edited to show the opposite of reality" which included a "slice of video that had removed the clear evidence" to testimony that the Video was "doctored" or "false" to simply stating, after being sued, that only "selected portions" of the Video were shown.   These changes illustrate his acknowledgment of his earlier statements' falsity and defamatory nature.

95.     Mr. Raffensperger's flip-flopping and changed narratives are evidence that, as a publisher of defamatory comments, he harbored serious doubts about the truth of his earlier statements.

96.     Mr. Raffensperger's changed narratives are deceptive in more ways than one.

97.     Firstly, the suggestion that there is something misleading about only showing relevant parts of a video that spanned greater than twenty hours is false.   That legislators should instead have sat for more than twenty hours to watch a video, most of which was irrelevant, is absurd.

98.     Secondly and most importantly, Mr. Raffensperger advanced a false narrative that he could knock down and thereby falsely declare the Video "debunked": He claimed to have discovered in his thorough investigation that in fact observers *were in the room* when election workers stored ballots under the table, and that the Trump Team did not show the segment of Video showing ballots being stored under the table - to hide this fact.

99.     The problem with his "debunking" of this claim is that it is a claim that Ms. Pick did not make.

100.   At no time did Ms. Pick claim ballots were stored without observers in the room.

101.   The entire point of Ms. Pick's presentation was that election officials announced to observers and members of the press that counting would end for the night when in fact it did not.   Ms. Pick could not find evidence that Fulton County gave the legally

28267790v1 97410.002.00

required notice of the count restart to give observers and the press the opportunity to return. Fulton County had been communicating to the press regularly throughout election day, yet Ms. Pick did not find evidence that they had issued a press release or communicated to the public to give the legally required notice.

102. Second, Georgia statute requires that all proceedings shall be done in public view, not under a shrouded table where a shell game could be played with ballot cases. Ms. Pick raised in her testimony the legitimate question of why the ballots under the table were separate from the others and not coming from the same place that ballots had come from throughout the day.

103. Ms. Pick did not refer to the ballots as "fraudulent." Yet, media outlets that profiled Raffensperger's book claimed Ms. Pick called the ballots fraudulent.

104. A timeline of news stories attacking the integrity of Ms. Pick's presentation shows a spike right after the publication of Mr. Raffensperger's book.

105. Mr. Raffensperger's Book repeatedly reminds that he has an office of twenty-three investigators, that they "tracked down every lead," and that after an extremely in-depth investigation of State Farm Arena, it is Mr. Raffensperger who has the truth.

106. The final report on the investigation of the events shown in the surveillance Video was not released until apparently June 2023, suggesting that the state devoted three years to investigating the events. Yet Mr. Raffensperger still appears to get wrong a fact as basic as who presented the Video—that he said he scrutinized so

carefully that he found a missing segment. In multiple statements, he misidentifies the Video presenter with extreme reckless disregard or blatant contradiction of the truth.

107. Tellingly, multiple state actors, litigants (Garland Favorito, David Perdue, Michael Daugherty), and private individuals (Joseph Rossi and Kevin Moncla) have investigated the events seen in the Video, and to the best of Ms. Pick's knowledge, none of them has suggested the Video evidence was not authentic and accurate. To the best of Ms. Pick's knowledge, the wholesale fabrication that the Video was "deceptively edited" etc. is sourced to Mr. Raffensperger, his Book, and statements.

108. Unfortunately, many authorities relied on information from Mr. Raffensperger and his Book Integrity Counts. As a result, a congressional Committee implied before a national audience that the Video was edited; a court issued public documents suggesting a source(s) put into evidence that the Video was "snippets" rather than a single, unedited video file; a public filing regarding election crimes refers to an "agent of the Defendant" playing a "misleading video;" Civil lawsuits refer to the Video as "edited."

109. Mr. Raffensperger's false words created enormous negative consequences for Ms. Pick: an online search of her name after the publication of Mr. Raffensperger's book yields dozens of hits implying that she is dishonest, discredited, debunked, or worse.

## THE DEFAMATORY STATEMENTS ARE "OF AND CONCERNING" MS. PICK

110.  Ms. Pick was the only person who presented the State Farm Arena Video, despite Mr. Raffensperger's repeated false statements that it was Rudy Giuliani, or "Rudy Giuliani and other lawyers." (p. 138).  The publicly available hearing video and transcript show Ms. Pick was the only one presenting the Video.

111.  Mr. Raffensperger knew the truth or showed reckless disregard for the truth regarding statements about the State Farm Arena Video.

112.  Further, after hearing Mr. Raffensperger's claims that the December 3, 2020 Video was an attempt to deceive the legislature, persons acquainted with Ms. Pick independently told her that this they believed the allegation defamed Ms. Pick.

113.  Finally, Ms. Pick's image was seen in videos and photos of her December 3, 2020, testimony that went viral with millions (perhaps tens of millions) of views worldwide, on national network television broadcasts, and in newspapers and online news outlets.

114.  The entire, unedited Video was available at the State Capitol for the presentation to the Georgia Legislature. The film shown and the manner of its presentation was and is a matter of public record. Ms. Pick's testimony to the Georgia Legislature was a matter of public record. As of December 3, 2023, the Georgia Legislature has a link to Ms. Pick's Video presentation available on its website.

28267790v1 97410.002.00

115. Upon information and belief, Mr. Raffensperger viewed the recording of the hearing, and therefore had actual knowledge his statements about the Video were false. Alternatively, it shows a reckless disregard for the truth for him without actually having viewed the testimony and Video described to claim the Video presenter doctored evidence to the legislature.

116. Mr. Raffensperger's defamatory statements were calculated to, and did, harm Ms. Pick's reputation, lowered her reputation in the estimation of the community, and will deter third persons from associating with, appointing, hiring, or dealing with her.

117. The resulting Google search of Ms. Pick's name is a life sentence of damaging first impressions.

118. Ms. Pick sent Mr. Raffensperger retraction demands on October 28, 2022, and again on April 5, 2024.

119. However, Mr. Raffensperger has thus far refused to retract or correct the defamatory statements, despite knowing of their falsity.

120. Mr. Raffensperger wrote the Book in his personal capacity, to aid in his reelection efforts and for personal profit. That is, Mr. Raffensperger sold the Book to further his political career and build his national brand using sensationalized, false information at Ms. Pick's expense.

28267790v1 97410.002.00

121. Ms. Pick's concerns about the poor management of Georgia's elections by its leadership have, in time, been proven out, with the press also confirming that Mr. Raffensperger has gone from "election hero to election zero" upon further inspection.

### RAFFENSPERGER TRIES TO REHABILITATE HIMSELF AT MS. PICK'S EXPENSE

122. Mr. Raffensperger starts with a regretful history when it comes to representations to a court that could implicate his honesty or competence. Georgia federal judge Totenberg issued an order noting Defendants' "far-fetched," and "flatly not credible" representations to the federal court with "blithe blindness" that "contradict[ed] the fulsome expert opinion and evidence" in an election-related case. *Curling v. Raffensperger, et al.*, Case 1:17-cv-02989 at Doc. 579, (p. 70) https://www.courtlistener.com/docket/6139924/curling-v-raffensperger/. It is possible that no American in the history of the country has had their integrity attacked more times by a federal judge on a single page of a double-spaced court order more than Mr. Raffensperger as a named defendant in that case.

123. Mr. Raffensperger's motive for changing the State Farm Arena narrative appears to include covering up his false statements to the Georgia legislature, in writing, on at least two occasions about the contents of the State Farm Video specifically, and Ms. Pick's presentation is what proved it.

124. In the Dec. 3, 2020, hearing before the Georgia Senate Subcommittee, a senator states on the record that the Secretary of State's office told the Subcommittee only an

hour before Ms. Pick's testimony that the Secretary of State had a state monitor present on election night at State Farm Arena the "whole time" or "entire time."   The Video proved in a most embarrassing way that Mr. Raffensperger was continuing through his office to cover up his failure to secure the election with false statements to the legislature as late as Dec. 3, 2020.

125.   A week later at a Georgia House hearing, State Rep. Turner stated that Mr. Raffensperger sent two writings to the legislature that falsely claimed—in bold print no less—that an election monitor was present at State Farm Arena while all counting took place.

126.   Rep. Turner held up a November 12, 2020, hard copy letter repeating the false claim signed by Mr. Raffensperger, and also referenced a November 19, 2020, email from Mr. Raffensperger making a substantially similar claim.

127.   According to the hearing transcript and video of this December 10, 2020, hearing, the Representative believed Mr. Raffensperger's prior representations until he saw the Video presented by Ms. Pick which proved that the state monitor was not present when counting resumed at State Farm Arena on election night. Rep. Turner investigated further and found that the state monitor admitted this in a FactCheck.org article dated Dec. 4, 2020. This video testimony by Rep. Turner is linked in the Georgia Legislature website and is found at 6:17:30 on https://www.youtube.com/watch?app=desktop&v=9EfgETUKfsI&feature=youtu.be.

28267790v1 97410.002.00

128.   In Rep. Turner's words, "The changing nature of the information that we have been getting as legislators from the Secretary of State's office has been most disappointing...The video comes out...debunking the claims in the video from [Raffensperger's] Senate testimony,...   They changed the story without even acknowledging they changed the story. That damages credibility. We have to be better than that...this is the best part. The Deputy Secretary of State told FactCheck.org that the monitor was not required to be there at all times, but she instructed him to return, after hearing from the new outlets that the county was going to cease counting for the night. *This means that the Secretary of State's office knew the entire time that there was not an observer in the room when ballot scanning was happening, and they sent two memos to us saying that there was. The story doesn't add up. Somebody isn't telling the truth.*"

129.   That "somebody" not telling the truth was the person whose signature appears on the letter Rep. Turner was holding—Mr. Raffensperger.

130.   This false statement to the Georgia Senate was in addition to the two false written statements to the legislature in November 2020 saying the same thing.  To the best of Ms. Pick's knowledge, the Defendant and his surrogates stopped making this false claim after Ms. Pick presented her video.

28267790v1 97410.002.00

131.   Therefore, Mr. Raffensperger or his surrogates falsely told the legislature that a monitor had been present at State Farm Arena the entire night three different times. This narrative changed after Ms. Pick presented her video.

132.   Raffensperger's surrogate, Gabriel Sterling, also contradicted Mr. Raffensperger when he admitted publicly that the State Monitor was not present for a considerable time period while counting was taking place.

133.   But for Ms. Pick's presentation, Mr. Raffensperger's lies to the legislature and others may never have been discovered.

134.   Mr. Raffensperger claims he does not know Ms. Pick and did not intend to damage her.   However, it is clear from Ms. Pick's name in numerous high profile media outlets and lawsuits repeating Mr. Raffensperger's defamatory statements that the public knew and understood Ms. Pick is exactly who Mr. Raffensperger referenced when he claimed that deceptive evidence had been presented to the Georgia legislature on Dec. 3, 2020.

135.   The repetition of the false accusation by these media outlets and lawyers who relied on the false statements of Mr. Raffensperger, post-publication of Integrity Counts, damaged Ms. Pick's reputation and cost her significant money in resultant legal fees and reputation repair.   These costs will continue to mount in the future with efforts to repair her reputation and necessary ongoing monitoring for reputational damage.

## ACTUAL MALICE

136. Mr. Raffensperger made his statements in Integrity Counts and subsequent national promotional interviews, from which he attempted to profit and did boost his political career. His allegations about Ms. Pick were knowingly false, defamatory, made with actual malice and common law malice, and have caused her severe damage.

137. Ms. Pick's testimony was true and her evidence was unedited and authentic, as Mr. Raffensperger knew from the start because the testimony and video were on the public record since Dec. 3, 2020. Claiming facts counter to the public record and publicly available video evidence of the public hearing or record – after conducting an extensive investigation of the same - is actual malice.

138. Mr. Raffensperger later made public statements that his office had reviewed the Video before the Dec. 3, 2020 hearing, so he had knowledge that the Video was authentic and unedited. This is actual malice.

139. At the time of his defamatory statements, Mr. Raffensperger was the chief elections official of the state of Georgia, had run for election in Fulton County multiple times, and had investigated the events at State Farm Arena with a large team of investigators. Therefore, he cannot claim ignorance of Fulton County election

28267790v1 97410.002.00

practices, election law, and election-related field jargon. He had knowledge that his statements casting aspersions about the use of the term "suitcase" were false, yet he ran with the false narrative. This is actual malice.

140.  Mr. Raffensperger admits being briefed on this state monitor's report, apparently more than once, and admits the media widely circulated the report and its contents, and so he and even the public knew of its existence and content.  Mr. Raffensperger knew of this report and its contents. Yet, he claims no knowledge that it used "suitcases" as election field jargon, weeks before Ms. Pick's testimony. This is flatly false and actual malice.

141.  Mr. Raffensperger's highly unreasonable conduct constituting an extreme departure from standards of investigation before publishing such serious claims under his name are actionable.

### Mr. Raffensperger's Defamatory Statements Are "of and concerning" Ms. Pick

142.  Mr. Raffensperger knew the truth or showed reckless disregard for the truth regarding statements about the State Farm Arena Video in that he sometimes misidentifies Ms. Pick as Rudy Giuliani. Ms. Pick and Mr. Giuliani do not look or sound alike.

143.  Ms. Pick was the only person who presented the State Farm Arena Video, despite Mr. Raffensperger's repeated false statements that it was Rudy Giuliani, or "Rudy Giuliani and other lawyers." (p. 138).  The publicly available hearing video and transcript show Ms. Pick was the only one presenting the Video.

144.    Further, after hearing Mr. Raffensperger's claims that the December 3, 2020 Video was an attempt to lie to the legislature, persons acquainted with Ms. Pick independently communicated to her that Mr. Raffensperger's statements defamed Ms. Pick.

145.    Finally, Ms. Pick's image was seen in videos and photos of her December 3, 2020, testimony that went viral with millions (perhaps tens of millions) of views worldwide, on national network television broadcasts, and in newspapers and online news outlets.

146.    Incredibly, despite all of the above, and despite having assailed the content of her presentation in exacting detail, Mr. Raffensperger filed an affidavit in an earlier lawsuit claiming he had not heard of Ms. Pick until she sent him a retraction letter in October of 2022.  While pretending to know nothing or to have not investigated may be an excellent legal strategy in a defamation case, this statement is, like others made by Mr. Raffensperger, flatly not credible.

147.    The entire, unedited Video was available at the State Capitol for the presentation to the Georgia Legislature. The film shown and the manner of its presentation was and is a matter of public record.  Ms. Pick's testimony to the Georgia Legislature was a matter of public record.  As of December 3, 2023, the Georgia Legislature has a link to Ms. Pick's Video presentation available on its website.

148.   Upon information and belief, Mr. Raffensperger viewed the recording of the hearing, and therefore had actual knowledge his statements about the Video were false. Alternatively, it shows a reckless disregard for the truth for him without actually having viewed the testimony and Video described to claim the Video presenter doctored evidence to the legislature.

149.   Mr. Raffensperger's defamatory statements were calculated to, and did, harm Ms. Pick's reputation, lowering her reputation in the estimation of her personal and professional communities, and will deter third persons from associating with, appointing, hiring, or dealing with her.

150.   The resulting Google search of Ms. Pick's name is a life sentence of damaging first impressions.

151.   Mr. Raffensperger's statements are false and were intended to discredit and defame Ms. Pick. While Mr. Raffensperger attributes many of his comments regarding the State Farm Video to the president's personal lawyer, Mr. Guiliani, Ms. Pick was the only witness to present the Video to the panel. Rudy Giuliani did not, but instead commented on the Video after Ms. Pick had completed her presentation and the chairman recognized Mr. Giuliani for his separate testimony. Ms. Pick was not affiliated with or working for Mr. Guiliani, and they did not communicate about or coordinate their respective December 3, 2020 testimonies. In fact, Ms. Pick had only met or spoken with Mr. Giuliani twice in her life at public events in 2018 or 2019.

152. To Ms. Pick's understanding, Mr. Giuliani was President Trump's personal counsel and not part of the firm with which Ms. Pick was volunteering.

153. Mr. Raffensperger's disparaging comments about the "deceptive," "chopped-up," "doctored" Video presentation which "removed...clear evidence" "so that it appeared to show the opposite of reality" could only refer to Ms. Pick.

154. Mr. Raffensperger at times misidentifies Mr. Giuliani as being the Video presenter, which is false and contradicts the hearing video, hearing transcript, widespread media coverage, and any other primary or secondary source of which the Ms. Pick is aware. Upon information and belief, this was Mr. Raffensperger's deliberate and deceptive strategy to change the narrative: to divert attention onto a big name and away from himself, specifically to avoid embarrassment for his failure to secure the election that the Video could represent. Because Ms. Pick was the actual presenter, and because the image of her presenting the Video had already gone viral across endless platforms with millions of views, the public and the press understood her to be the target of the defamation and her reputation became collateral damage.

155. Journalists published many damaging statements after the Book's publication of and often after or simultaneous with the same media outlet reviewing or promoting the Book. That they used Ms. Pick's name show that there is no mistaking who the Defendant was referencing:

156.  "…Jacki Pick claimed on Dec. 3 that an election worker…hid a suitcase of ballots under a table…Secretary of State Brad Raffensperger quickly called BS on Pick's claim." DailyKos, 12/3/21

157.  Mr. Raffensperger said that Mr. Giuliani or his people "sliced and diced the video…" The journalist says he is certain that the prosecutor has the book "close at hand." (Atlanta Journal Constitution's "Breakdown" True Crime podcast, Season 9, Episode 1, June 2022).

158.  The Atlanta Journal Constitution refers to the Video as "edited." (July 5, 2022)

159.  CNN identified Ms. Pick by name and reported that she "…presented heavily edited video…that purportedly showed…suitcases of illegal ballots according to court filings. That allegation was investigated by state election officials and quickly proven false." (CNN, July 5, 2022) (While the source of the information that formed the basis of the court filing is not disclosed, it is public information that Mr. Raffensperger was the first person to testify before the Fulton County Special Purpose Grand Jury according to the AJC's Breakdown true crime podcast, Season 9, Episode 7, August 1. 2022).

160.  CNN again reported that Ms. Pick played a "heavily edited video" that state investigators proved false. (Sept. 7, 2022).

161.  Atlanta Journal Constitution journalist notes that Mr. Raffensperger called the Video "doctored." AJC's legal expert opines that Mr. Giuliani could be facing charges

and an AJC journalist adds, "ditto for the video Giuliani played that showed selectively edited snippets of vote counting at Atlanta's State Farm." (Atlanta Journal Constitution's "Breakdown" True Crime podcast, Season 9, Episode 3, July 4, 2022)

162. Top media outlets have contacted Ms. Pick to ask for comments about the the allegations.

163. That multiple media outlets name Ms. Pick shows that multiple journalists had no problem discerning that the defamatory statements were "of and concerning the Plaintiff."

## DAMAGES

164. Mr. Raffensperger's publication of defamatory statements that identified Ms. Pick, both as an individual presenter of the video and as part of an ascertainable small group, caused Ms. Pick substantial actual harm, quantifiable in damages, past, present, and future, applicable to all Counts.

165. Mr. Raffensperger's publication of defamatory statements caused reputational damages. She is a licensed but non-practicing attorney, podcaster, speaker, and had ambitions to receive political appointments. Her future professional success depends on a reputation of integrity and credibility. Mr. Raffensperger's defamatory statements make it highly unlikely that she will receive the same or equal opportunities, personal and professional relationships that she has enjoyed in the past.

28267790v1 97410.002.00

166.   Ms. Pick has spent a lifetime building her reputation and overcoming adversity. She was raised by a single mother in Appalachia, at times beneath the poverty line, and was the first in her family line to graduate from college, earning full academic scholarship and later graduation from a top twenty law school.

167.   Ms. Pick becomes emotional when describing how she came from nothing and built her life and reputation from the ground up, only to have it shattered and knocked down by Mr. Raffensperger in an instant.  Mr. Raffensperger has now built a national brand and platform for himself by sensationalizing false statements about Ms. Pick.

168.   Before Mr. Raffensperger's defamatory statements, Ms. Pick enjoyed a good reputation and was approached for high-level governmental and other influential positions. Because of Mr. Raffensperger's defamatory statements, her reputation has been irreparably damaged, and at least one expert opines that she is no longer a viable candidate for political or professional appointments.

169.   Mr. Raffensperger's defamatory claims regarding Ms. Pick have also repeatedly been parroted in the news media at the highest level concerning one of the biggest media events in American history.

170.   Despite the knowingly false statements being widely attributed to him in the press, to Ms. Pick's knowledge, he has made no efforts to correct them despite two requests.

28267790v1 97410.002.00

171. To Ms. Pick's knowledge, the only source of any alleged wrongdoing by Ms. Pick is Mr. Raffensperger's manufactured claim.

172. Ms. Pick has suffered damage as a result including, but not limited to, mental anguish, physical injuries, and reputational injury, in her personal and professional community, in the press, on social media, and in the courts.

173. More specifically, Ms. Pick has suffered embarrassment, stress, humiliation, and mental anguish because of Mr. Raffensperger's defamatory statements. This mental anguish has resulted in sleeplessness, anxiety, and has significantly affected Ms. Pick's enjoyment of life. She has sought counseling. The time since Mr. Raffensperger published his Book has been the most emotionally challenging of Ms. Pick's life.

174. Ms. Pick has also suffered physical injury and pain because of Mr. Raffensperger's defamatory campaign. The stress caused by Mr. Raffensperger's defamation exacerbated her pre-existing medical conditions including her heart arrythmia—for which she has already undergone two heart procedures—and condition that causes damage to her voice and her ability to speak. She lost weight due to stress, chronic mental and physical fatigue, and exhaustion.

175. Ms. Pick has lost months of her life addressing legal issues precipitated by Mr. Raffensperger's defamation campaign and has accrued enormous sums in legal fees defending against false narratives that have, upon information and belief, been precipitated and perpetuated by Mr. Raffensperger's false claims. Ms. Pick has

expended and will continue to expend an enormous amount of time and money repairing her reputation, including working with reputation management professionals, attorneys to request retractions, and whatever else is needed to restore her good name. She has experienced and will continue to experience out-of-pocket expense. She has had and expects to continue to have limited success in securing retraction unless or until receiving a retraction from Mr. Raffensperger or a judicial finding that Mr. Raffensperger defamed her because news outlets choose to rely on the false statements of Mr. Raffensperger. Even if this occurs, she knows that no matter how much time and money she spends, she cannot completely un-ring the bell of the defamatory accusations that Mr. Raffensperger thrust into the national public debate.

176.  Mr. Raffensperger's unlawful behavior warrants the imposition of punitive damages against him to the extent permitted by law.

## COUNT 1—DEFAMATION, CIVIL LIBEL – DEFAMATION PER SE, LIBEL, LIBEL PER QUOD, LIBEL BY INNUENDO

177.  Ms. Pick incorporates her prior paragraphs.

178.  Mr. Raffensperger published false statements in his November 2, 2021, Book claiming Ms. Pick presented deceptively edited Video to the Georgia legislature. In fact, Ms. Pick played raw, uncut, unaltered Video, the file of which spanned more than twenty hours in full. Ms. Pick did not edit the Video at all.

179.  Mr. Raffensperger also falsely accused Ms. Pick of sensationalizing with the use of the term "suitcase," when that was the exact terminology for ballot transfer

bags used by Mr. Raffensperger's own state election monitor in his November 13, 2020, report to the Georgia State Election Board.  It was also the term poll workers used to refer to the ballot transport bags in affidavits.

180.  Mr. Raffensperger's statements were of and concerning Ms. Pick as she was the only individual to show the Video at the December 3, 2020, hearing.  Claims that someone presented a deceptively edited Video from State Farm Arena could refer to no one but her.

181.  Mr. Raffensperger made his statements with actual malice, knowledge that his statements were false or with reckless disregard for the truth or falsity of his statements. He has repeatedly and publicly claimed that he or his agents watched the State Farm Video and the December 3, 2020, testimony before the Committee.  He had to know his statements suggesting the State Farm Video was deceptively edited were false when he made them.

182.  By virtue of the affidavits signed by poll workers and served on him in December 2020 in the *Trump v. Raffensperger* election contest, he knew that the term "suitcase" was a term utilized by Fulton County election administrators and the State's own election monitor to describe where Fulton County stored their ballots.

183.  Ms. Pick pleads actual malice as to all of the defamatory statements identified above—both those in the Book, the book taken a whole, and statements after the Book's publication. Mr. Raffensperger's statements were false and gave a

28267790v1 97410.002.00

defamatory impression by omitting material facts or juxtaposing facts in a misleading way.

184. Any reasonable person reading the cited statements would construe them to be defamatory.

185. Mr. Raffensperger's claims that Ms. Pick's Video presentation was deceptive and false could not have a non-defamatory meaning. Neither could his claims that she lied by calling the ballot containers "suitcases" be anything but defamatory.

186. Mr. Raffensperger's defamatory statements were defamatory per se because they reflect on Ms. Pick's fitness to conduct her business and trade and therefore injured her in her office, profession, and occupation. As discussed above, Ms. Pick produces an educational podcast focused and is, in effect, an opinion journalist. Accusing a journalist of presenting a "deceptively" "sliced-and-diced" or "chopped-up" Video in a deliberate attempt to mislead a government body to attempt to undermine an election goes to the heart of journalistic integrity and is harmful to her in her profession and community.

187. Mr. Raffensperger's statements were also defamatory per se because they accused her of committing a crime—false statement or evidence before the legislature—potentially placing her in legal jeopardy at precisely a time when he knew that authorities were investigating election-related crimes.

28267790v1 97410.002.00

188. Mr. Raffensperger damaged Ms. Pick's reputation with false and malicious statements, exposing her to public hatred, contempt, and ridicule.

## COUNT 2: FALSE LIGHT

189. Ms. Pick incorporates her prior allegations.

190. Mr. Raffensperger's conduct created the existence of false publicity that depicts Ms. Pick as someone which she is not.

191. Moreover, the false light in which Mr. Raffensperger placed Ms. Pick would be highly offensive to a reasonable person.

## COUNTS 3 AND 4: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS OR ALTERNATIVELY, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

192. Ms. Pick Incorporates her prior allegations.

193. As described in this complaint, Mr. Raffensperger's conduct was intentional or reckless; it was extreme and outrageous; there is a causal connection between his wrongful conduct and Ms. Pick's emotional distress; and her emotional distress is severe.

194. Alternatively, Mr. Raffensperger's conduct was negligent and caused Ms. Pick emotional and physical injuries that that cause her mental suffering and emotional distress.

## PRAYER

Wherefore, Plaintiff prays for judgment against Defendant for each of the causes of actions raised herein.  Plaintiff respectfully requests a judgment in her favor and against Defendant for:

A. Actual and compensatory damages, including general, actual, consequential, and special damages in excess of $75,000;

B. Punitive Damages;

C. Reasonable and necessary attorneys' fees;

D. Reasonable and necessary costs of the suit;

E. Prejudgment and postjudgment interest at the highest lawful rates;

F. Declarative relief stating that the statements authored and published by Defendant and those attributable to Defendant as foreseeably reasonable republications identified within this complaint, individually and collectively, were and are false;

G. Injunctive relief enjoining Defendant to remove his false and defamatory statements about Plaintiff from any website and/or social media account under his control and the removal of his Book from the market;

H. A written retraction of defamatory statements and an apology from Defendant; and

I. All other relief to which she is entitled.

Dated: April 15, 2024

28267790v1 97410.002.00

Respectfully submitted,

/s/ J. Mitchell Little
J. Mitchell Little
SBOT # 24043788
2600 Network Boulevard, Suite 400
Frisco, TX 75034
(214) 472-2140
Mitch.Little@solidcounsel.com
(pro hac vice pending)
SCHEEF & STONE, LLP

/s/ William G. Whitehill
William G. Whitehill
SBOT # 21356550
8080 Park Lane, Suite 700
Dallas, Texas 75231
T 214.265.3862 | F 214.691.6311
bwhitehill@condontobin.com
(pro hac vice pending)
CONDON TOBIN SLADEK THORNTON
NERENBERG, PLLC

/s/ John J.Park Jr.
John J. ParkJr.
P.O. Box 3073
Gainesville, GA 30503
678-608-1920
703-888-8329

**COUNSEL FOR PLAINTIFF**

EXHIBIT

B

**AFFIDAVIT**

**STATE OF GEORGIA**

**COUNTY OF COBB**

Personally appeared before the undersigned attesting officer, duly authorized to administer oaths in said State and County, Michelle Branton, who after being duly sworn, deposes and says upon oath:

1. My name is Michelle Branton, and I am a resident of Cobb County Georgia. I am employed by Georgia Republican party as a   Field Organizer.  I am over the age of 18 and make these statements based on my personal knowledge of the facts, matters and events described herein.

2.  As I stated, I am employed by the Georgia Republican Party and so for the November 3, 2020 General Election, I was to be involved in monitoring the ballot counting process. On the night of the November 3rd election, I was assigned by Regional Field Director Brandon Moye to be a Poll Watcher and to report to the Fulton County Board of Elections Warehouse, located at 1365 English Street NW, Atlanta, Georgia, at 6:30 p.m..

3.  After arrival, I  was then reassigned to the State Farm Arena in downtown Atlanta to watch the processing of Absentee Ballots and arrived at around 8:15 p.m.  At State Farm arena, I joined Mitchell Harrison, Field Organizer for the GAGOP.  Mitchell and I entered the State Farm Arena at the same time as the news crew from Fox News which included their broadcaster, photographer, and producer.

4. Upon arrival in the processing room located on Level S of State Farm Arena, we were supposed to watch the processing of the Absentee Ballots from the observation area which was delineated by a fenced area of roping secured by posts.  This observation area we were put in was very distant from the staff actually processing the ballots. The room where the ballot processing took place is a very large room, and this distance effectively prevented our actual observation of the process.  In addition, other areas of this -- again very large -- room were not visible at all from our observation area.

5. For example, the machine that copied the UOCAVA electronically received ballots (sometimes called military ballots)  onto a paper copy of same could only be viewed from the side and the

doors to that area were positioned in a way that prevented us from any viewing of this process. Additionally, the scanners that scanned the absentee ballots were not visible to us at all.

6. The only way we knew that the scanners were located across this large room and was that Regina Waller, Public Affairs Manager for Elections was onsite and she described the process to Mitchell and me. There were several different news crews that came and went that evening from this same observation area. The Chairman of the Fulton County Commission, Robb Pitts, was there most of the night along with his personal assistant, another lady, and his security guard. At the time, I thought it was unusual that the Commission Chairman would be personally involved in the processing of ballots. Chairman Pitts left before the processing stopped later that evening. Additionally, Joe Carn, another Fulton County Commissioner was also onsite. Mr. Carn stayed until right before the processing stopped and spoke with Mitchell and me. Regina Waller, Public Affairs Manager for Elections for Fulton County was also onsite for the entire time and was still onsite when we departed.

7. As the night progressed, most of the staff processing the removal of the inner envelopes and ballots from the outer envelope of the Absentee Ballots stopped working; however, there was one employee that continued working when the others had stopped. That last employee to finish was a younger woman. After that last employee completed her stack at approximately 10:30 p.m., a woman across the room where the scanners were allegedly located yelled to everyone to stop working and to return the next day at 8:30 a.m. This lady had appeared through the night and Mitchell and I believed her to be the supervisor. The supervisor was an approximately 35-35 year old female, with hair that was blonde and braided which came at least to the middle of her back in length.

8. After the "supervisor" gave her instruction, nearly all of the staff workers left, except the supervisor described above, another much older lady that had a shirt on that said "Ruby" on it, and one other lady that I cannot recall her appearance, and Regina Waller, the Public Affairs Manager for Elections. so, at the time that work stopped at about 10:30 I recall those four employees remaining.

9. At this same time,, we along with the Fox News crew were the only other persons as I recall left in the room. We had been instructed by Brandon Moye to obtain the number of ballots processed and the number that were still remaining to be processed We attempted to obtain

this information three separate times from Regina Waller and she would not give an answer and she also appeared to be calling someone asking them for advice on how to respond to our request. Afterwards, Regina Waller would only say "it could be obtained on the website".

10. After concluding that Regina Waller would not give us this information on the number processed versus the ones still left to be processed,, we along with the Fox News crew left the State Farm Arena shortly after 10:30 p.m.  When we left, Regina, the "supervisor" and only two other people remained in the area of the scanners, the lady with the "Ruby" on her shirt was sanitizing the tables and tablecloths, and the third lady was further across the room and I could not tell what she was doing.  Regina Waller was sending an email, as she relayed to us, when we left.

11.  We were then told to return to the Fulton County Board of Elections Warehouse on English Avenue. Shortly after we arrived at the Warehouse Facility, Regina Waller entered the facility within 15-20 minutes of when we arrived. The English Avenue facility is a huge warehouse storing election machines, scanners and other election equipment.

12.  Sometime thereafter while still at English Avenue, Mitchell Harrison and Brandon Moye advised they heard counting was still going on at State Farm Arena and Mitchell Harrison and Trevin McKoy, field organizers, were sent to confirm the ballots were again being counted at the State Farm Arena. I did not go with them on the return to State Farm.

**FURTHER THE AFFIANT SAYETH NOT.**



_____
Michelle Branton

Sworn to and subscribed before me
this ⟨8th⟩ day of November, 2020.

_____
Notary Public

3

EXHIBIT

C

## AFFIDAVIT OF BRIDGET THORNE

Comes now, Bridget Thorne, and after being duly sworn makes the following statement under oath:

1.   My name is Bridget Thorne.

2.   I am over the age of 21 years, and I am under no legal disability which would prevent me from giving this declaration. If called to testify, I would testify under oath to these facts.

3.   I reside at 1195 Seale Drive, Alpharetta, GA 30022.

4.   I was certified by Fulton County as a voting technician. I was hired as a certified technician to temporarily assist Dominion Voting Systems with preparation for the Fulton County Georgia General Election from October 27 thru November 1, 2020 at the Georgia World Congress Center, Building B, where all of the Fulton County voting machinery was tested and calibrated.

5.   The testing and calibration process entailed printing 21 test ballots for each ballot marking device (BMD) from each voting precinct. (The number of test ballots was dictated by the 21 candidates in the Loeffler senate race.)

6.   Based on my knowledge and belief, the test ballots could have been run on plain paper, making them easily distinguishable from live Georgia ballots.

7.    The test ballots were printed on the same Roland Voter Paper (heavy cardstock) as used for actual ballots, making them, in every way, indistinguishable from live Georgia ballots.

8.    Over the entire course of my experience, these test ballots were handled by Dominion employees in a haphazard and careless way.  At times there were stacks of "test ballots" unsecured all over the facility.

9.    I am personally aware that some batches of test ballots were lost during the process and I was required to reprint entire polling districts test ballots a second time.

10.    On October 28, I became concerned that these ballots were unsecure and indistinguishable from live ballots, so I began, with my daughter, Kenedy Thorne (also a technician for Dominion Voting) to "spoil" some of the ballots by either marking through the QR code on the ballot with a pen or simply tearing the ballot.

11.    I spoiled approximately a couple thousand test ballots.

12.    Based on my knowledge and belief, there were thousands of test ballots that were not spoiled.

13.    The test ballots were ostensibly collected for shredding, but I do not know if they were ever shredded.

14.    During the testing and calibration process, a consultant from The Elections Group named Mike (LNU) was present.

15.   On November 1, 2020 approximately 10 pm, I observed Mike assisting another employee with generating test ballots for a district. Mike, however, was generating random ballots. He was not using the procedure for generating test ballots. I explained to Mike that he needed to generate the test ballots in a particular way, specifically, voting for the first candidate first, the second candidate on the next, etc. Mike asked me, "Do I have to vote for Trump?" I told him he did.

16.   During the testing and calibration process, Richard Barron, the Fulton County Supervisor of Elections was present during much of the time.

17.   On October 30, 2020, after the conclusion of early voting, all the equipment from the State Farm Arena was brought to Georgia World Congress Center, Building B to be prepared for election day voting.

18.   When the equipment was brought in, Dominion personnel began to prep the equipment for election day. As part of the process, the vote tabulators (scanners) were all opened. There were approximately 50 tabulators from State Farm Arena.

19.   Every tabulator had voted ballots in the ballot bins. These were, based on my knowledge and belief, actual voted ballots from early voting that were not removed and secured.

20.    The ballots were removed by Dominion personnel and stacked, haphazardly. Some were left unattended for periods of time.

21.    Based on my knowledge as a poll manager, these voted ballots should have been securely transported using two-person security. These ballots were simply left in the scanners and dropped at the warehouse.

22.    There were Dominion personnel alone with scanners in all parts of the facility removing ballots from these machines.

23.    During the process, these ballots were eventually gathered in suitcases (ballot cases) and collected into the corner of the facility.

24.    At one point, I saw 50-60 ballot cases stacked in the corner. I estimate that each case could have held over 6,000 ballots.

25.    I was upset by this. One of the warehouse employees, Tia (LNU) told me, "Bridget, don't worry about it...we've been doing this all week."

26.    On election day, I was credentialed as the Poll Manager at the Johns Creek polling location. I was told in an email sent to all poll managers from my regional supervisor (supervisor of elections office) the Sunday before election day that we would have ACLU "clerks" for absentee ballots in each precinct.

27.    I replied all and asked what, exactly, these ACLU clerks would be doing. Nobody of authority from Fulton County answered.

28.    I was at the Georgia World Congress Center, Building B when the email exchange took place and Richard Barron was behind me, so I went and asked him about the ACLU clerks.

29.    He gave me the impression that the supervisor should not have mentioned the ACLU. He said, "She shouldn't have said that [meaning ACLU clerk]. She should have just said you are having absentee clerks," or words to that effect.

30.    I looked on the Atlanta ACLU website and they were advertising to have people come to volunteer as absentee clerks.

31.    When I arrived at Johns Creek on election day, there was a woman from the ACLU there who served as the absentee clerk.

32.    She told me she was a lawyer and was trained earlier that week.

33.    I was given a laptop for her to use, but we could not find the password. She told me she would just use her personal laptop.

34.    She, apparently, had access on her personal device to the voter database in order to clear the absentee voter.

35.    I do not recall if she had a name tag or badge, but she was in the voting area near the poll pad station.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of November 2020.

Bridget Thorne

State of Georgia
County of ___Fulton___

Appeared before me Bridget Thorne, this 17th day of November 2020 and after being duly sworn, stated the forgoing statements are true and correct to the best of her knowledge and belief.

Notary Public

My commission expires __05/01/2021__

EXHIBIT

A

**AFFIDAVIT**

**STATE OF GEORGIA**

**COUNTY OF CHEROKEE**

Personally appeared before the undersigned attesting officer, duly authorized to administer oaths in said State and County, Mitchell Harrison, who after being duly sworn, deposes and says upon oath:

1. My name is Mitchell Harrison, and I am a resident of Cherokee County Georgia. I am a college student, but also work for the Georgia Republican party as a Field Organizer. I am over the age of 18 and make these statements based on my personal knowledge of the facts, matters and events described herein.

2. As part of my assignment with the Georgia Republican party, I was to monitor ballot counting and processing in Fulton County. On the evening of election night, November 3, 2020 I reported to the Fulton elections office located at 1365 English Street in Atlanta. There I met with Brandon Moye, the Regional Field Director. Brandon assigned Michelle Branton and I to go observe the counting of absentee and military ballots at the State Farm arena location in downtown Atlanta. I understood that Michelle and I were to be involved in closely monitoring the ballot counting process.

3. After arrival at State Farm Arena, Michelle and I were taken to an observation area located on Level S. Besides Michelle and myself, there was also a news crew from Fox News and I believe 11 Alive. For Fox News this included their broadcaster, photographer, and producer. The observation area itself was roped off, leaving us very far away from the ballot counting activity we were assigned to monitor. Also, there were certain areas of the large counting room that we could not see at all due to angles, doors, and walls. We were specifically instructed by Fulton officials that we could not leave that area to observe from any other location or vantage point.

4. The room where the ballot processing took place is a very large room and there were at least 25 employees working there, I am not sure of the exact number. Michelle and I noted that Robb Pitts, the Chairman of the Fulton County Commission was in the counting room and stayed there

1

for much of the night.  Also, Joe Carn, another Fulton Commission member was in the counting room area, and he actually spoke with us briefly.

5. It was frustrating during the time Michelle and I were there because we were kept so isolated from where the ballot processing and counting activity was actually taking place.  The location and layout of the observation area, ironically, made it difficult to observe much that was going on in the ballot counting area.

6. For example, the machine that copied the UOCAVA electronically received ballots (sometimes called military ballots)  onto paper copies could only be viewed from the side and the doors to that area were positioned in a way that prevented us from any viewing of this process. Additionally, the scanners that scanned the absentee ballots were not visible to us at all.

7.  The only way we knew that the scanners were located across this large room and was that Regina Waller, Public Affairs Manager for Elections spoke to us at one point and she described the process to Michelle and to me.  There were several different news crews that came and went that evening from this same observation area.

8. Sometime after 10 o'clock p.m., the counting activity slowed. Shortly afterward, a younger lady with long braided but blond hair yelled out to all of them they should stop working and come back tomorrow (the next day, Wednesday November 4th) at 8:30 A.M..  Thereafter, all but 4 election employees left State Farm, leaving just the blond haired lady (who Michelle and I assumed was the supervisor), two older ladies and Regina Waller at the location. This lady had appeared through the night and Michelle and I believed her to be the supervisor.

9. Another task we had been given by Brandon was to inquire how many ballots had been processed and how many were still left to go.  We posed these questions to Regina Waller, the Public Affairs Manager for Elections.  She seemed uncomfortable at times answering us, and she called someone which we interpreted as asking for help on how to respond to us.  Ultimately, she refused to answer our questions and told us we had to "look it up on the website".  In all, we asked Regina Waller for this information at least three separate times and she would not give us an answer.

10. After concluding that Regina Waller would not give us this information on the number processed versus the ones still left to be processed, we along with the Fox News crew left the

State Farm Arena shortly after 10:30 p.m.  When we left, Regina, the "supervisor" and only two other people remained in the area of the scanners.

11.  We were then told to return to the Fulton County Board of Elections Warehouse on English Street. Shortly after we arrived at the Warehouse Facility, Regina Waller entered the facility within 15-20 minutes of when we arrived. The English Street facility is a huge warehouse storing election machines, scanners and other election equipment.

12.  Sometime thereafter while still at English Street, we heard from news crews that ballot counting was still going on at State Farm Arena, even though we were told it had ceased for the night and would not resume until Wednesday morning.  So, Brandon Moye asked Trevin McKoy and I to go back to State Farm arena.  This was just before 1:00 A.M. on Wednesday morning.

13. When Trevin McKoy and I arrived at State Farm, we were told that counting had been going on, but had just ended in the last few minutes.  We asked the security representative to take us to the ballot counting area, initially he was hesitant and called his supervisor for instruction. That second person arrived and he agreed to take us in. He told us his name was Phillip.  When we arrived at the same observation area, there was no one counting ballots. Again we were told that those counting the ballots had "just finished" and that there had been about 5 people there.   Trevin and I thought that was odd because at 10:30 P.M., Regina Waller and the supervisor lady had said they were done counting for the night, and would not resume until 8:30 A.M. the next morning.

**FURTHER THE AFFIANT SAYETH NOT.**

_Mitchell Harrison_

Mitchell Harrison

Sworn to and subscribed before me
this 9 day of November, 2020.

Notary Public

ANGELINA ROSA GARCIA
NOTARY
EXPIRES
GEORGIA
January 9, 2024
PUBLIC
CHEROKEE COUNTY

3

EXHIBIT

D

State of Georgia

County of Fulton

## AFFIDAVIT OF CAROLINE JEFFORDS

Appeared before me this 16th day of November, 2020, Caroline Jeffords, and after being duly sworn, stated the forgoing under oath and confirmed said statements are true and correct to the best of her knowledge and belief:

1.    My name is Caroline Jeffords.

2.    I am over the age of 21 years, and I am under no legal disability which would prevent me from giving this declaration.  I have personal knowledge of the facts recited herein. If called to testify, I would testify under oath to these facts.

3.    I reside at 4380 Paran Summit Ct., NW, Atlanta, Fulton County Georgia 30327.

4.    I am credentialed to serve as a volunteer GOP monitor at the State of Georgia vote recount held at the World Congress Center located in Atlanta, Fulton County, Georgia.

5.    Around 12:45 p.m. on Saturday, November 14, 2020, I arrived at the Georgia World Congress Center to witness the vote counting, duplication, and vote review panel process.

- 1 -

6.   After watching some of the ballot counting at the tables, I decided to stand beside tables where they were counting and then entering in the vote totals after each ballot box had been completed.

7. I witnessed that there was no consistent or uniform work-flow process being followed by the counters, who were doing it in different ways. In at least one case, only one person was counting at a table instead of the required two people counting at a table.

8. The ballots were contained in what appeared to be suitcases with zipties in what did not appear to be a very secure area.  I have video evidence of this.

9. I witnessed several irregularities with the counters not following the proper workflow process. This includes counters leaving in the middle of counting, tallies not being counted, and also a table with a counter sitting by himself (table 123).

10.  At approximately 2:57pm I reported to the people in charge of the vote recount where I was observing at table 124 – to Richard Barron, Fulton County Elections Director, and Caryn Ficklin, an elections supervisor, and also to Carter Jones, Georgia State Elections Board Monitor. Cheryl Ringer was also present later and she stated she was an attorney.

11.  When I questioned the process, I was harassed, intimidated, and bullied by Rick Baron who literally got in my face and was very nasty.  Mr. Baron and Carter Jones did not dispute that what I had witnessed was a violation of the rules, but instead kept excusing them by saying *"people are human"* and *"people have to eat and go to the bathroom."*

12.  I wrote the vote tallies and numbers along with table numbers of those in question. I also heard a counter, when questioned if they were finished, stating "We did what you told us to do" (responding to Patrice). I was told she was the main county attorney.

13.  One of the tables in question was table 123 and Adams Park was the batch (ICP 2) for advanced voting. The number of ballots stated to be in the suitcase was 3,161. The numbers recorded were 75 Trump, 2,109 Biden, 12 Jorganson, 0 Overvotes, and 5 Write-in votes.

14.  I also noticed that table 123 had only one person counting ballots.  I

have video evidence of this rule violation.  This one counter had a huge

stack of ballots for Biden and a small batch of ballots for Trump, which

looked to me like a ratio of 9 to 1, which shocked me given the closeness of

the race in Georgia and across the country.

15.  One other of the tables in question where both counters left in the

middle of counting was table 124, and CT Martin was the batch for

advanced voting. The number of ballots stated to be in the suitcase

was 3,456. The numbers recorded were 105 Trump, 3,311 Biden, 15

Jorganson, 7 Overvotes, and 15 Write-in votes.

Further affiant sayeth not.   I declare under penalty of perjury that the

foregoing is true and correct.

Executed this 16ᵗʰ day of November, 2020.

CAROLINE JEFFORDS

Notary Public

My commission expires 6/21/24

EXHIBIT

E

## AFFIDAVIT OF SUSAN MICHELLE LONG

Comes now, Susan Michelle Long, and after being duly sworn makes the following statement under oath

1. My name is Susan Michelle Long.

2. I am over the age of 21 years, and I am under no legal disability which would prevent me from giving this declaration. If called to testify, I would testify under oath to these facts.

3. I reside at 10725 Avian Drive, Alpharetta, Georgia, 30022.

4. This is in Fulton County.

5. My experience and background include working in public accounting, finance and budgeting, a consultant for Verizon and corporate security and data analytics.

6. On Saturday, November 14, 2020 and Sunday, November 15, 2020, I volunteered at the Georgia World Congress Center, located at 285 Andrew Young International Boulevard N.W., Atlanta, Georgia, 30313, located in Fulton County.

7. I volunteered with the GOP to witness the hand count of the presidential ballots.

8. I understood that the audit would be conducted in front of the public, the press and assigned party monitors, as well as livestreamed.

9. I was there to observe the 300+ volunteers audit the ballots.

10. When I first arrived, I was shocked at the lack of internal controls.

### No Chain of Custody for Suitcases of Ballots

11.     At tables 122, 98, 93, 76, 37, 24, 46 and 80, two (2) suitcases were left on top of the audit tables with no supervision.   The ballots were the "split count" ballots from Saturday afternoon.

12.     All the suitcases were intermingled – suitcases that had already been counted were placed with suitcase that had not been counted.

13.     The suitcases were kept in the same room with the "counters", "talliers", "loggers".

14.     The suitcases were left next to the entrance/exits, which allowed easy access for anyone to take them.

15.     There was never any security around the suitcases and if there had been a fire, water pipe failure, or an emergency, the ballots would have been destroyed because they were kept in suitcases, brown cardboard boxes and tote boxes.

16.     The suitcases were distinguished by serialized, color-coded "intabs" that were easy to break. The colors were green, red and orange. The serial numbers of the suitcases were not tracked.

17.     The "intabs" were handed out to people and were left on tables.  Everyone had access to these "intabs".

18.     The precinct and number of the ballots in the suitcase was written on a neon green piece of paper – similar to your name on a suitcase.  "Counters" were able to pull these papers out and it was easy to manipulate.

## No Checks and Balances for the "Loggers"

19. The process to log the suitcases was conducted manually by a "logger" and the ballot counts were logged on pink sheets of paper.

20. There were four (4) "loggers" that tracked the suitcases by table number.

21. At one point, the "loggers" became backlogged because they could not find suitcase #70 on their sheet. I believe it was because they were processing this manually and the persons' handwriting was so sloppy.

22. The "runner" ended up breaking the seal on one of the suitcases because they did not know what was inside. When he broke the seal, he discovered that there was an envelope with ballots in it. He then sealed it up with another red "intab". This seemed improper and was never questioned. This was done outside of the "counter's" supervision.

## Procedures Were Not Followed or Enforced

23. The Supervisors did not properly supervise the "counters" during the ballot counting.

24. Table 23 did not have a tally sheet, so the person pulled out his own pen and paper to keep track of the ballot counts.

25. Row 4 (no table number) counters were sitting across from each other, rather than next to each other, which violated the procedures and no one said anything or took corrective action.

26. Table 44 and 145 had their cell phones out and were looking at their phones which was against the documented procedures.

27.    Table 43 had food and drinks on the table, which was against the procedures and could have ruined the ballots.

28.    Personal belongings were allowed at the tables with the ballots – this included backpacks, purses, lunch boxes and tote bags.

29.    People could use their own pens.

30.    At Table 128, the lady fell asleep with her head on the table.

31.    Table 122 put one ballot in the wrong pile.

32.    Monitors were too far away to watch whether the ballots were identified to going to the correct candidate.

33.    If one of the "counters" had a question, they had to raise a white paper with a red question mark. I witnessed people grow tired of sitting with their hand raised and stopped asking questions.

34.    A "counter" told me that there were a lot of write-ins for Jesus.

35.    Table 129 did not follow procedures.

36.    I witnessed that Table 51 received a suitcase without a seal. The "counter" stated, "this bag does not have a seal". It was still counted anyways. It was labeled EP03A. The total ballots was 175.

37.    I witnessed Table 117 receive a suitcase without a seal.  They counted it anyways.  It was labeled SC27.  The ballots totaled 110.

38.    I witnessed Table 123 open a suitcase of ballots, get through half of it and then leave for the day.  This was based upon the supervisors telling them this.  The next

morning, they continued counting.   These suitcases were on top of table 123 with no supervision when I arrived on Sunday at 6:50 a.m.

39.   On Saturday, Table 122 had two (2) "counters" made up of an elderly lady that was around eighty (80) years old paired with a woman that was around sixty-five (65) years old. The elderly woman had a terrible time seeing and then separating the ballots. The other woman had a vision problem. The elderly woman did not return the next day.

40.   Table 42 had a "counter" that had hearing issues and vision issues.  He would do anything his partner told him.  She would shout, "Biden, Biden, Biden" and he put them in Biden's stack.  He also said the count was 1,000 and she said 1,010.  They used 1,010.  I pointed this out to a Supervisor and they never took corrective action.

41.   At one point, three (3) Democratic female monitors began circling the one (1) GOP female monitor, acting aggressively towards her and prevented her from observing the audit.

42.   When I would ask the Supervisors a question, the Democratic monitors would call out to the Supervisor, "You do not need to answer that".  There was a man with a name tag that read, "Election Official", who overheard the comments and never corrected them. He never corrected the Democratic Monitors behavior.  When I asked to see the tally totals at one table, he came up to the table and told the counters, "YOU DON'T HAVE TO ANSWER HER QUESTIONS".  He proceeded to follow me around the floor.  The next day one of the counter's told me that I did not bother her, but the women that would circle the tables was distracting (these were the Democratic Monitors).

43.    One table got a lot of attention from the media and the monitors. This table reported "Table 99% to Biden", which is a disproportionate amount of votes for the presidential candidate. A member of the media said to me, "that is statistically impossible". No one had them recount the ballots or spot check the stacks.

44.    Sunday morning at least 50% of the counters had nothing to do, I noticed that when the counters finished counting the ballots from their suitcase, they were allowed to leave. This was improper. I witnessed counters begin to count faster, so they could leave sooner. If the process had been structured the ballots could have been completed on Saturday.

45.    As people collected their belongs to leave, this was a distraction to the remaining counters. They were able to stop and chit-chat at the tables that were counting. This process was done Saturday afternoon at around 4 pm and Sunday morning around 9:15 am.

46.    I saw a media camera on the counting floor. They were not escorted by anyone with credentials. No one was paying attention to the media that was walking among the ballots.

47.    At approximately 8:45 am, there were twenty (20) tables not doing any work.

48.    I heard a worker say that "they are trying to determine if all of the suitcases have been counted".

49.    The counts from the day before had been left on the table. The ballots were now in two unsupervised suitcases. No supervision to ensure the correct suitcase was counted.

50.   At approximately 9:15 am, they announced if you did not have any ballots, you could leave.

51.   This was surprising to me, because if they did not have any ballots to count, they should have completed the audit Saturday night. This reminded me of election night.

52.   There was a mass exodus as everyone began to gather their belongings and say goodbye to one another.

53.   Workers went up to other workers and interrupted the counting of their votes.

54.   Other workers walked through tables of ballots that were being counted.

55.   There was not any security checking the personal belongings of the workers as they left to ensure nothing had been taken.

56.   There was no security at the doors.  People were free to come in and out as they pleased.

57.   When the tables dwindled down to a few tables, supervisors were still scarce.

58.   Table 121 had to wait approximately one (1) hour to have their counted suitcase picked up.

59.   When the employees were reminded to not have food, drink, telephones or personal belongings on the table, Table 122 put their belongings, breakfast, juice bottles and bananas in the suitcase that was full of ballots.  There was no one supervising them or watching them to tell them that could damage the ballots.

60.   On Sunday morning, some of the counters did not show-up so they paired them with someone else that had not been trained. It became obvious that they had not been trained in the audit procedures.

61.   Table 122 had one veteran counter and one man that had not been trained. I heard the veteran say, "however you want to do it". They began to work independently – without dual counting or observation. The table was a mess. A supervisor came up to the table and asked them, "How's it going?" Although she saw that they were not dual counting, she did not say anything to them.

62.   Additionally, Table 122 commented that they were "shocked with the number of ballots for Trump" which was improper. This was the suitcase from the Ocee Library located in North Fulton County.

63.   Table 117 explained the procedures to his partner. I was surprised that they did not make the counters watch the short training video.

64.   Tables 122 and 123 were counting with only one (1) person at the table. A supervisor was on a microphone reminding everyone that they were not allowed to touch the ballots unless their partner was there but it was ignored.

65.   Table 122, audited the Ocee Library, which is a primarily Republican area and the area that I live. The total suitcase count was 3,387 votes. This was contrary to the totals: Trump- 1,320; Biden- 1,365; Jorgensen- 43; Blank- 6; Write-In- 19.

66.   Because of my experience and background, I was surprised by the lack of control on the tally sheets.

67.   For the split counts – the ballots in a suitcase counted on Saturday and the remaining ballots from the same suitcase – these were split into 2 suitcases. They were on top of the tables with no one watching them. The tally sheet was on the table and the remaining count was added to the count the night before.

68. The tally sheet and the suitcase were given back to the "runner".

69. In my opinion, this should have been two (2) separate people.

70. The talliers were in the same room as the counters and the ballots.

71. In my opinion, this was improper, and they should have been separated in order to maintain an internal control.

72. The counters were given the batch totals.

73. In my opinion, it should have been a blind count and later reconciled.

74. The tally sheets were printed on orange paper and red ink pens were used to write the totals. This made it difficult to read and caused confusion and errors.

75. Almost all the tables I observed were matched with the same partner from the day before. In my opinion, the pairs should have been separated in order to main checks and balances.

76. Per the documented procedures, "If the container contains more than 1000 ballots, ballots should be removed from the container and sorted in manageable stacks (using an Audit Board Batch Sheet for each stack)." I never witnessed this process being done.

77. Per the documented procedures, the counters were supposed to seal the containers. The suitcases were sealed by the runner/other Fulton county employee. I did not witness the serial number on the "intab" (used for sealing the suitcase) being documented on the Audit Board Sheet.

78. If the Georgia Recount was to be successful, there should have been proper checks and balances in place, with internal controls. There should have been an evidence room with all the ballots with limited access. Another room would have everything needed

for the counters.   Another secure room with limited access would contain the counted ballots. There should have been monitors designated to keep track of everything. There should have been random audits throughout the day. The teams should have been rotated out and switched around throughout the day.

79.    In my opinion, the Georgia Recount was a failure due to the lack of oversight, supervision and mismanagement of the ballots, counters, talliers, runners, loggers, etc. Also, there was not a person responsible for the oversight of the complete the process that took responsibility.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of November, 2020.

Susan Michelle Long
678.777.7114
Smlong10@gmail.com

State of Georgia
County of DeKalb

Appeared before me Susan Michelle Long, this 30th day of November 2020 and after being duly sworn, stated the forgoing statements are true and correct to the best of her knowledge and belief.


_Ruthann P Lacey_
Notary Public

My commission expires February 28, 2024

This Affidavit was notarized pursuant to Executive Order 04.09.20.01 using Zoom as real-time audio-visual communication technology.

EXHIBIT

F

## AFFIDAVIT OF GUILLERMO LELLA

Comes now, Guillermo Lella, and after being duly sworn makes the following statement under oath:

1.    My name is Guillermo Lella.

2.    I am over the age of 21 years, and I am under no legal disability which would prevent me from giving this declaration. If called to testify, I would testify under oath to these facts.

3.    I reside at 10575 Morton Ridge Dr Alpharetta, GA 30022.

4.    I was hired by a temporary agency as a certified technician to assist Dominion Voting Systems with preparation for the Fulton County Georgia General Election at the Georgia World Congress Center, Building B, where all of the Fulton County voting machinery was tested and calibrated.

5.    One evening, I'm not positive when but it could have been October 30, 2020, after the conclusion of early voting, equipment was brought to Georgia World Congress Center, Building B to be prepared for election day voting.

6.    On this evening there was a truckload of equipment brought in including a significant number of standalone tabulation devices.

7.    When the equipment was brought in, Dominion and temporary personnel began to prep the equipment for election day. As part of the process, the vote tabulators (standalone scanners with ballot bins) were opened.

8.    As the tabulator bins were opened, I saw that they had voted ballots in the ballot bins. At the time, I was told that they were actual ballots from early voting.

9.    I also personally observed several tabulation devices that were still sealed and, in addition to actual voted ballots, the devices contained the vote data cards.

10.    The supervisor at the site asked for volunteers to handle the ballots. I asked if she was sure the ballots bins could be opened before election day. She told me that she had orders and it was going to happen so that the equipment could be prepared for election day.

11.    I refused to empty the ballot bins and handle the ballots.

12.    I observed the ballots and data cards being removed by Dominion personnel and temporary workers and bound with rubber bands and stacked.

13.    There was no supervision or oversight of the process.

14.    I saw ballots being put in suitcases (ballot cases) but I do not know where they went from there.

15.    I am not sure how the data contained in the cards was handled.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this __24__ day of November 2020.

Guillermo Lella

State of Georgia
County of _Cherokee_

Appeared before me Guillermo Lella, this ____ day of November 2020 and after being duly sworn, stated the forgoing statements are true and correct to the best of his knowledge and belief.

Linda H Parker
NOTARY PUBLIC
Cherokee County, GEORGIA
My Commission Expires January 12, 2024

_Linda H Parker_

_____
Notary Public

My commission expires _01-12-2020_