## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| JACKI PICK, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 1:24-cv-01607-ELR |
| BRADFORD JAY | ) | |
| RAFFENSPERGER, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO DISMISS AMENDED COMPLAINT
## AND INCORPORATED MEMORANDUM IN SUPPORT

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Bradford Jay Raffensperger moves to dismiss this action with prejudice:

### INTRODUCTION

This is a lawsuit for defamation and related torts based on *Integrity Counts*, a book by Georgia Secretary of State Brad Raffensperger published in November 2021. In addition to profiling the Secretary, the book recounts the events leading up to and following the Georgia 2020 presidential election, including President Trump's January 2, 2021 call to Secretary Raffensperger to "find 11,780 votes."

*Integrity Counts* neither names nor specifically mentions plaintiff, a fact omitted from her 59-page amended complaint. Yet, plaintiff's kitchen-sink-style

pleading tries to allege that the book somehow defames or otherwise actionably wrongs her. *See* Am. Compl. [Doc. 23] at 1 (claiming "civil libel, defamation including defamation per se, libel, libel per quod, libel by innuendo in light of extrinsic facts, and false light based on statements in his book").

For numerous reasons, each of which independently requires dismissal, the complaint fails to state a claim.

## STATEMENT OF THE CASE

Pursuant to the incorporation-by-reference doctrine, a court considering whether a complaint plausibly alleges a defamation claim may review the entirety of the publication complained of—in this case, *Integrity Counts* (Ex. 1)—without converting the motion into one for summary judgment. *Horsley v. Feldt*, 304 F.3d 1125, 1134-35 (11th Cir. 2002). A court may likewise consider other material, *e.g.*, videotapes, highlighted in but not attached to the complaint, the authenticity of which is not in genuine dispute. *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023). A court may also review other information, *e.g.*, court records and news articles, under the doctrine of judicial notice. *Turner v. Wells*, 879 F.3d 1254, 1272 (11th Cir. 2018); *Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013). Pursuant to these well-established principles, the background properly before the Court in considering whether the complaint plausibly alleges facts supporting its claims is as follows:

### *The Parties*

Plaintiff Pick is a Texas lawyer and podcaster who in the wake of the November 2020 presidential election traveled to Atlanta and took to the airwaves to promote allegations that the election in Georgia had been corrupted by widespread fraud. Am. Compl. ¶¶ 4, 31, 49, 62, 115, 165.[1]

Defendant Raffensperger is Georgia Secretary of State and co-author of the book plaintiff claims defamed her. Am. Compl. ¶ 32. In Texas, where this case was first filed, he swore in support of a successful motion to dismiss for lack of personal jurisdiction that he was unfamiliar with plaintiff when the book was developed and that his first recollection of seeing or hearing her name was when he received a retraction demand almost a year after the book's publication. *Id*. ¶ 148. *See* Ex. 2 (Tex. Compl.); Ex. 3 (Tex. Decl.); Ex. 4 (Tex. Demand).

### *Giuliani's "Smoking Gun" Claim of Criminal Election Fraud*

Plaintiff's lawsuit revolves around a notorious claim of Georgia election fraud first advanced in the weeks after the 2020 election by Trump attorney Rudy Giuliani. Giuliani claimed that a security camera videotape of ballot counting at State Farm Arena constituted "smoking gun" evidence that Fulton County election

---

[1] On December 3, 2020, for example, plaintiff told a national radio audience that it was "cut and dried" that there had been over 100,000 illegal Georgia votes. *The Ben Shapiro Show (*https://fb.watch/spVqgiDgYL/) (time stamp 6:51).

workers Ruby Freeman and Shaye Moss had hidden fraudulent ballots in secret suitcases under a table. *See, e.g., Matter of Giuliani*, 197 A.D.3d 1, 18-19 (N.Y. App. Div. 2021). Last year, Giuliani stipulated to the falsity of the claim in a federal defamation suit brought by the workers in which he has been ordered to pay over $148 million in compensatory and punitive damages. *See Freeman v. Giuliani*, 2024 U.S. Dist. LEXIS 67783, 2024 WL 1616675 (D.D.C. 2024). Earlier this month, Giuliani was disbarred, in part for falsely and dishonestly advancing the claim. *Matter of Giuliani*, 2024 N.Y. App. Div. LEXIS 3602, at *15-16, 31, 2024 WL 3259538 (2024).

As part of an overall presentation by Giuliani and the Trump legal team in Georgia, plaintiff presented portions of the State Farm videotape at a December 3, 2020 Georgia Senate Judiciary subcommittee hearing. The full videotape shows no fraud, only Fulton County election officials going about their jobs processing and tabulating absentee ballots.[2] But the snippets of the video presented by plaintiff and commented on by Giuliani attempted to portray the opposite.

At the hearing, plaintiff directed certain portions, totaling about 30 minutes, of the 20-hour-long videotape to be played while she provided commentary. Tr.

---

[2] Plaintiff's complaint references the full State Farm "surveillance video ('Video')" more than 80 times but does not provide access to a copy.  The full videotape may be accessed by following the instructions included in the folder linked in Exhibit 5.

(Ex. 6) at 10-41.[3] She began by promising "to explain to you the evidence we have from State Farm Arena here in Fulton County" that "goes to what [Georgia Trump lawyer] Ray [Smith] was talking about in terms of fraud or misrepresentation." *Id.* at 11. She then used snippets of the tape to illustrate what she called an "operation" involving ballots pulled out from under a table and then counted in numbers that "probably is certainly beyond the margin of victory in this race." *Id.* at 18-20.

In advancing this claim, plaintiff repeatedly misrepresented the affidavits of two Republican poll watchers.  In their affidavits attached to plaintiff's complaint, the two do not state that they were told they had to leave or that they were kicked out of State Farm Arena. Rather, they state that they left on their own volition because counting activity had slowed and they understood from a premature announcement that it was about to end for the day. *See* Branton Aff. [Doc. 1-2] ¶¶ 7-9, Harrison Aff. [Doc. 1-1] ¶ 8. Plaintiff, on the other hand, told senators that "our Republican observers were *forced to leave*" and in "*contravention of the statute*" election worker Moss—"the lady with the blonde braids"—had "*cleared the place out*" under "the *pretense* that they were going to stop counting"; and that, once the "*coast is clear,*" she and Freeman "*move into action*" and pull "ballots out

---

[3] The Georgia Senate Judiciary subcommittee hearing video is available at https://www.youtube.com/watch?v=hRCXUNOwOjw.

from under this table" and "begin scanning." Tr. (Ex. 6) at 14-16, 18, 40 (emphasis added).

A focus of plaintiff's presentation was a black tableclothed table covering what she called "suitcases" of ballots. "Watch this table," plaintiff insisted, as she played excerpts of the table's setup at 8:22 am, how the table looked at 9:56 pm and 10:35 pm and then showed ballot containers taken from beneath the table at 11:00 pm and counted. Tr. (Ex. 6) at 15-19. Explaining that "a team of us" had watched the video to see if it was "normal to store suitcases of ballots under a table under a tablecloth"—and "we don't see that"—plaintiff posited as critical questions: "What was the chain of custody? Where did they come from? Who put them there? When did they put them there?" *Id.* at 16-17. Plaintiff then told the committee that she could not answer these questions because, "[w]e're going to need about 14 hours to watch it carefully." *Id.*

Plaintiff did not tell senators that she could have immediately provided clear and innocent answers to these questions simply by showing a segment of the videotape that her presentation had bookended but for some reason skipped. That skipped segment clearly showed election workers packing ballots in secure, sealed containers and, beginning at 10:06 p.m., placing them under the table for storage

for the night, all while media and observers were still present. Ex. 5 (time stamp 10:06-10:30pm).[4]

Following presentation of the State Farm video, Giuliani told legislators they had just seen "smoking gun" evidence of criminal election fraud. Tr. (Ex. 6) at 255-56. Then he and the Trump campaign immediately used a 90-second video of excerpts from the presentation to amplify the claim worldwide, with Giuliani asserting that "[t]he video tape doesn't lie," "[i]t's now beyond doubt," "[w]atch it and Biden is not-elect anything," and "[t]he State Legislature has no choice but to assume its powers under the US Constitution, article II (1)(2) and select Trump electors." Ex. 7 (Giuliani tweets).

The Giuliani claim was quickly and publicly rebuffed by the Secretary of State's office and others who viewed the full videotape and pointed out the obvious and important part of the tape omitted.[5] But that did not stop plaintiff from again participating in a hearing with Giuliani a week later to re-present the videotape to a

---

[4] *See, e.g.*, 60 Minutes Overtime, "Georgia Election Official Refutes Trump Voter Fraud Claims." CBS (Jan. 10, 2021) (highlighting skipped segment), *available at* https://www.youtube.com/watch?v=pjKXvqSNIkk.

[5] *See, e.g.*, J. Gray, "Georgia election officials show frame-by-frame what happened in Fulton surveillance video," WSB-TV (Dec. 4, 2020), *available at* https://www.wsbtv.com/news/politics/georgia-election-officials-show-frame-by-frame-what-really-happened-fulton-surveillance-video/T5M3PYIBYFHFFOD3CIB2ULDVDE/.

committee of the Georgia House, where Giuliani once again used it to make

baseless allegations of fraud. Tr. (Ex. 8) at 86-87, 90-94, 103.[6]

### President Trump Relies on the Giuliani False Claim and Video in His January 2, 2021 Call

On January 2, 2021, when President Trump telephoned Secretary

Raffensperger looking to "find 11,780 votes," Giuliani's false claim that the State

Farm video showed "suitcases full of fraudulent ballots" was one of the president's

major talking points. As detailed in *Integrity Counts*' chapter 9—which consists of

an annotated transcript of "The Call"—the president repeatedly cited "the tape

that's been shown all over the world" and the claim that it showed fraudulent

ballots being pulled out from "the table with the black robe and the black shield"

and "[t]hey weren't in an official voter box; they were in what looked to be

suitcases or trunks." Ex. 1 at 168-69; 168-97 (calling Freeman "a professional vote

scammer and hustler" and referring to her and the video no less than 19 times).

This deluge of disinformation about suitcases full of fraudulent ballots

hidden under a table was only possible because the State Farm security videotape

presented to the Georgia legislature omitted, as did the Giuliani tweets and Trump

campaign ads that followed, the segment showing that the ballots under the table

---

[6] Video of the Georgia House committee hearing is available at
https://www.youtube.com/watch?v=9EfgETUKfsI.

were simply ballots, like other ballots, that had been opened and prepared for

scanning, placed on top of the table, and then when election workers thought they

were going home for the night, securely packed in sealed containers, and stored

under the table, all while media and party observers were present.[7]

### The Statements at Issue

The complaint is by no means a model of clarity. To the contrary, it is a

classic example of what the Eleventh Circuit calls shotgun pleading, more intent on

maligning Secretary Raffensperger than on stating a claim. But its identification

and explanation of what it asserts as actionable may be discerned. The statements

plaintiff complains of are all found in a chapter of *Integrity Counts* entitled "Sixty

Days of Disinformation," and, specifically, in three of the chapter's more than 50

short sections. Am. Compl. ¶ 3.[8]  The gravamen of plaintiff's complaint is that she

---

[7] Even a cursory review of the original State Farm videotape, as opposed to the snippets presented to the legislature and tweeted to the public, shows that taking ballots from the table in question to the scanning area for tabulation was consistent with ballot counting procedures used throughout the day. Examples of election workers taking ballots from that table to the scanning area to be tabulated are evident in the full video (Ex. 5) at 10:03 am, 10:53 am, 11:52 am, 1:57 pm, and 3:14 pm to name a few.

[8] The three sections are as follows:

- GIULIANI'S SLICED-AND-DICED VIDEO is a three-page section from the book's description of the election-related events of Thursday, December 3, 2020. Ex. 1 at 138-140. It discusses the State Farm videotape unveiled to the Georgia Senate Judiciary committee that afternoon, explains that Giuliani and the team used the videotape to "show the exact opposite of reality," and accuses

was wronged by what she claims these three sections of *Integrity Counts* implicitly said about her, even though none name or specifically reference her.

First, she claims that the book wronged her in these three sections by using terms such as "sliced-and-diced" and "chopped up" to refer to the fact that the presentation to the Georgia legislature had highlighted some segments of the State Farm videotape to arouse suspicions while omitting a segment in between that would have shown the suspicions to be baseless. Am. Compl. ¶¶ 3-5, 29, 84-86. Her assertion seems to be that what she calls this "litany of 'edited' synonyms" falsely implied that the videotape had in fact been physically altered in some way,

_____

Mr. Giuliani of intentionally misleading senators when he told them the videotape provided "powerful smoking gun" evidence of voter fraud. *Id*.

• WSB-TV INVESTIGATIVE REPORTER REVIEWS VIDEO is a two-paragraph section from the book's description of the election-related events of Friday, December 4, 2020. Ex. 1 at 143-44. It reports that Gabe Sterling, chief operating officer for the secretary of state's office, asked an Atlanta investigative reporter to review the State Farm security camera videotape and then repeats verbatim the reporter's two tweets to the effect that the videotape revealed nothing improper. *Id*.

• ANTI-DISINFORMATION MONDAY is a three-page section from the book's description of the election-related events of Monday December 7, 2020. Ex. 1 at 146-48. It reports, and largely quotes verbatim from, a press conference at the Georgia Capitol by Secretary Raffensperger and COO Sterling to "straighten out some of the disinformation Rudy Giuliani and others had fomented" the week before, including the State Farm claim. It prefaces Sterling's remarks debunking that claim, and its tale of what Sterling called "secret suitcases," by stating that Sterling was "exasperated at having to punch down more lies, this time about Giuliani's sliced-up video." *Id*.

*see* Am. Compl. ¶ 4 (alleging that "[t]he truth is that Ms. Pick presented authentic, uncut, unedited video footage to the legislature"), or should have been played in its entirety. *Id*. ¶ 5 (alleging that "Mr. Raffensperger knew full well that… to show the entire [v]ideo would have been impractical in a legislative hearing, mostly irrelevant, and absurd").

Second, she claims, these sections of the book wronged her by attempting to correct references to "suitcases."  In her presentation to the Georgia legislature, plaintiff had called the sealed ballot containers under the table "suitcases." Ex. 6 at 17. This label was then echoed by Giuliani and others—including President Trump in his January call—to support the false assertion that the boxes contained fraudulent ballots that did not belong there and should never have been counted. *See, e.g.*, Ex. 1 at 168-69 (Trump: "[t]hey weren't in an official voter box; they were in what looked to be suitcases or trunks. Suitcases."). The book recounts efforts to correct this assertion, and plaintiff challenges two of the book's references to suitcases in doing so. Specifically, she claims the book wronged her by repeating tweets from a WSB-TV investigative reporter who reviewed the State Farm video, found that "[t]he boxes were packed & sealed with observers in room—nothing improper," and then stated: "These are not suitcases." *Id*. at 143-44; Ex. 9 (Justin Gray tweets). *See* Am. Compl. ¶¶ 12, 63, 88. She also claims that the book wronged her by describing COO Sterling's exasperation at "having to

punch down more lies, this time about Giuliani's sliced-up video" when in a

December 7, 2020 press conference, he explained:

> What you saw, the "secret suitcases" [with Gabe's air quotes] with magic
> ballots, were actually ballots that been packed into those absentee ballot
> carriers by the workers in plain view of the monitors and the press. …

Ex. 1 at 146-47 & n. 118. *See* Am. Compl. ¶¶ 3, 87.

Plaintiff's overall claim is that *Integrity Counts* wronged her, despite not

naming her, by stating that the version of the State Farm security videotape she

presented to the Georgia legislature had been selectively edited and by reporting

that what the presentation had called suitcases were secure ballot containers that

had been packed and sealed while the media and party monitors were still present.

*E.g.*, Am. Compl. ¶¶ 3, 6, 16, 85, 184.[9]

For the multiple independent reasons stated in this motion, plaintiff fails to

state a claim for defamation. That claim as well as its time-barred throwaway claim

for another tort should be dismissed with prejudice.

---

[9] According to the complaint, presenting misleading evidence to the legislature is
"a crime under Georgia law," Am. Compl. ¶ 85. But the complaint cites no statute
to that effect and *Integrity Counts*, even with respect to Giuliani, makes no such
charge. Ex. 1 at 139. In fact, it implies the opposite. *Id*. (arguing that Giuliani
would not tell a judge what he told the legislature because "Attorneys are bound to
tell the truth in court").

## **ARGUMENT**

To survive dismissal, a complaint must plead facts sufficient to support every element of each cause of action. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also* Fed. R. Civ. P. 8. The Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* If the facts alleged, taken as true, do not "state a claim to relief that is plausible on its face," the complaint must be dismissed. *Iqbal*, 556 U.S. at 678; Fed. R. Civ. P. 12(b)(6).

This rule applies with special force in cases such as this one. "[T]he Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits" in order "[t]o preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth." *Von Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017). Early dismissal of defamation lawsuits is favored. *See, e.g., Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) ("there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation").

The Eleventh Circuit regularly affirms the dismissal of defamation claims on 12(b)(6) motions. *See Michel*, 816 F.3d at 707; *Turner v. Wells*, 879 F.3d 1254, 1273-74 (11th Cir. 2018); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,

6 F.4th 1247, 1252-53 (11th Cir. 2021); *Jacoby v. Cable News Network, Inc.*, 2021

U.S. App. LEXIS 36594, at *6, 2021 WL 5858569, at *4-6 (11th Cir. 2021).

### The Complaint Does Not Plausibly Allege
### a Defamation Claim

Under Georgia law, a libel plaintiff must establish among other things (1) a

false statement of fact (2) of and concerning the plaintiff (3) that is defamatory and

(4) published with the requisite degree of fault. *See, e.g., Mathis v. Cannon*, 276

Ga. 16, 20-21 (2002); *Lewis v. Meredith Corp.*, 293 Ga. App. 747, 748-49 (2008).

Here, the complaint fails to state a claim because the statements plaintiff

challenges (1) are not of and concerning plaintiff; (2) plaintiff cannot bear her

constitutionally imposed burden of proving the statements false, much less

defamatory, and (3) the complaint fails to plausibly allege that the statements were

published with the requisite fault: "actual malice." Plaintiff fails to sufficiently

allege *any* of these required elements.

### The Statements Challenged Are Not Of and Concerning Plaintiff

An essential requisite of any claim for defamation is the publication of a

false and defamatory statement *of and concerning plaintiff*. The 'of and

concerning' requirement "stands as a significant limitation on the universe of those

who may seek a legal remedy for communications they think to be false and

defamatory and to have injured them." *Sack on Defamation* § 2:9, at 2-144 (4th ed.

2013) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 399-400 (2d Cir.

2006) (Sack, J.). In the context of commentary on government and quasi-government operations, it is a limitation required by the First Amendment. *See generally New York Times Co. v. Sullivan*, 376 U.S. 254, 290-92 (1964) (statements critical of police department cannot constitutionally be treated as statements 'of and concerning' its police chief for purposes of the latter's libel action); *Cox Enterprises v. Carroll/City/County Hospital Authority*, 247 Ga. 39 (1981); *Atlanta Humane Society v. Mills*, 274 Ga. App. 159 (2005).

Whether or not a publication satisfies this requirement is a question of law for determination by the Court. *See, e.g., Ledger-Enquirer Co. v. Brown*, 214 Ga. 422 (1958); *Fiske v. Stockton*, 174 Ga. App. 601 (1984). It is not essential that a publication name a person to be of and concerning them, but the allegedly defamatory words must be reasonably understood as referring to "some ascertained or ascertainable person, and that person must be the plaintiff." *Fiske*, 174 Ga. App. at 602 (quoting *Ledger-Enquirer*). Whether or not the plaintiff is named in the publication, if the words are not reasonably understood as making such a reference, "no averment or innuendo" can make the publication actionable. *Id.* at 602-03 (affidavits of witnesses that they "knew" the statement referred to plaintiffs immaterial). *Accord Willis v. United Family Life Ins.*, 226 Ga. App. 661, 663 (1997) ("[e]ven express mention of one's name with another accused of misconduct … does not constitute defamation"); *Stevens v. Morris Comm. Corp.*,

-15-

170 Ga. App. 612, 613-614 (1984) (affirming dismissal of "patently absurd complaint" that plaintiff was defamed by being named as counsel for a nursing home in a report on poor conditions there).

Here, the statements challenged by plaintiff plainly fail to meet this requirement. One would not know it from the complaint but nowhere in the book is plaintiff named or even individually referenced, including in the book's discussion of the portions of the State Farm security videotape presented to the Georgia legislature. The underlying premise of the complaint is that, in effect, every reference to the State Farm security videotape, in *Integrity Counts* or elsewhere, is by implication a reference to her. But that is not legally the case.

The Georgia Court of Appeals' decision in *Cox Enterprises v. Bakin*, 206 Ga. App. 813 (1992), *cert. denied*, 510 U.S. 869 (1993), illustrates the point. In *Bakin*, the libel plaintiff was an emergency room doctor involved in the controversial treatment of a patient admitted for stab wounds who bled to death in the hospital emergency room seven hours later. *Id*. The doctor contended, much as plaintiff does in this case, that because he was publicly identified in initial reporting on the controversy, subsequent reporting on the controversy was by implication about him even though he was not named. *Id*. at 816-17. The court accepted an interlocutory appeal to reject this contention as a matter of law. It ordered dismissal of all claims based on the 29 of 31 articles that did not

specifically name or reference plaintiff because they were not about him. *Id*. at 816-17 (the articles "certainly contain no reflection on any particular individual with regard to [the patient]'s death"). The court also ordered dismissal of all remaining claims because the statements challenged in the two articles that did name plaintiff were not false and defamatory. *Id*. at 817-18 ("what is written specifically about appellee is essentially true").

The Eleventh Circuit's decision in *Horsley v. Feldt*, 304 F.3d 1125 (11th Cir. 2002), is to the same effect. In *Horsley*, the court ruled that the district court had properly dismissed, as not about plaintiff, comments about a murder that named neither plaintiff nor the website that he hosted. *Id*. at 1136 ("a plaintiff 'cannot rely on rumor, innuendo, and extraneous circumstances to create an inference of defamation'") (quoting *Willis*, 226 Ga. App. at 663). Only claims as to statements that "specifically mentioned" plaintiff's website were allowed to remain. *Id*. at 1137.

Here, nowhere in the book is there any specific mention of plaintiff. In discussing the December 3 legislative hearing—in a section pointedly titled, GIULIANI'S SLICED-AND-DICED VIDEO—the book refers only to the presentation "of witnesses and a video" by "Rudy Giuliani and other lawyers for President Trump," a category that plaintiff's original complaint took pains to make clear did not include plaintiff. *See* Compl. [Doc. 1] ¶ 55 ("[w]hile Ms. Pick is an

attorney, she was not counsel for the Trump legal team. She stressed at the beginning of her testimony that she was appearing as a volunteer and not as a lawyer"). *See also* Am. Compl. ¶ 152 (alleging that plaintiff "was not affiliated with or working for Giuliani").

GIULIANI'S SLICED-AND-DICED VIDEO does not single out any editor or presenter of the videotape other than, of course, Giuliani. And it is Giuliani and Giuliani alone whom the book accuses of using the selective portions of the videotape shown during the hearing to mislead the Georgia legislature: "Giuliani intentionally misled our senators." Ex. 1 at 139. In its numerous discussions of Giuliani's "suitcases full of fraudulent ballots" claim, the book never identifies any individual on the Trump team, paid or volunteer, lawyer or otherwise, other than Giuliani. Whenever *Integrity Counts* mentions the State Farm security videotape, it is never ambiguous about the individual upon whom it places responsibility and opprobrium for the misleading excerpts and their use: Giuliani.

To try to avoid the reality that *Integrity Counts* is not about her, plaintiff resorts to misrepresenting the book's contents. One would not know it from the complaint but *all* the challenged statements in the book that refer to the State Farm video presented by plaintiff refer to it as *Giuliani*'s video. *See, e.g.,* Ex. 1 at 138 ("Giuliani's Sliced-and-Diced Video"), 139 ("Giuliani's chopped-up video"), 146 ("Giuliani's sliced-up video"). *Compare* Am. Compl. ¶¶ 3-4, 29, 84-86, 154, 183

(referencing these descriptions but deleting Giuliani reference). Plaintiff goes so far as to allege that, "Mr. Raffensperger refers to the Video Ms. Pick presented to the Committee with an all-caps subject heading describing it as 'SLICED-AND-DICED VIDEO.'" Am. Compl. ¶ 84. This allegation is disingenuous. As noted, the heading of the section is, in fact, GIULIANI'S SLICED-AND-DICED VIDEO. Ex. 1 at 138.

The book's statements challenged by plaintiff are not 'of and concerning' plaintiff.

### Plaintiff Cannot Prove the Statements Challenged Are False

In a defamation case, the challenged statements must also be provably *false*. In any case involving speech on a matter of public concern, as this case undoubtedly does, the plaintiff bears the burden of proving falsity. *Philadelphia Newspapers v. Hepps*, 475 U.S. 767 (1986); *Adventure Outdoors. v. Bloomberg*, 552 F.3d 1290, 1298 (11th Cir. 2008) (citing *Mathis v. Cannon*, 276 Ga. 16, 21, (2002)); *Cox Enterprises v. Thrasher*, 264 Ga. 235 (1994). The plaintiff must plausibly allege facts showing that she can meet this burden or the complaint must be dismissed.

The law overlooks minor inaccuracies and concentrates on whether the challenged statements are substantially true. *Bryant v. Cox Enterprises*, 311 Ga. App. 230, 234 (2011). The question is whether the statements sued upon—those

that are not protected as statements of unverifiable opinion or loose figurative language or rhetorical hyperbole that cannot reasonably be interpreted as assertions of fact—are substantially true or whether plaintiff can sustain the constitutionally imposed burden to prove them materially false. *Bryant*, 311 Ga. App. at 234-35, 243. *See generally Horsley v. Rivera*, 292 F.3d 695, 701-02 & n. 2 (2002). It is not sufficient to point out inaccurate details that, even if not trivial, would not if corrected

have altered the picture the true facts paint. *Jaillett v. Georgia Television Co.*, 238 Ga. App. 885 (1999) ("a statement is not considered false unless it would have a different effect on the mind of the viewer from that which the pleaded truth would have produced"). The law requires proof by plaintiff of the substantial falsity of the challenged statements. *Stange v. Cox Enterprises*, 211 Ga. App. 731, 735 (1994) ("minor factual errors which do not go to 'the substance, the gist, the sting' of the story" are not actionable) (quoting *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991)). Plaintiff cannot bear this burden with respect to any of the statements she challenges.

Plaintiff's first contention seems to be that *Integrity Counts* falsely implied that the State Farm videotape presented to the General Assembly had been physically altered prior to its presentation or, to have been presented in a non-deceptive manner, was required to have been played in full, all 20 plus hours of it.

Am. Compl. ¶¶ 3-5, 86. This contention is entirely without merit.  The book makes neither implication.  Rather, it accurately states that by using some segments of the State Farm video to arouse suspicions while ignoring other segments that made clear those suspicions were baseless, "Rudy Giuliani and other lawyers for President Trump presented witnesses and a video that had been deceptively sliced and edited so that it appeared to show the exact opposite of reality." Ex. 1 at 138. The context makes clear that the descriptors "sliced and diced," "chopped up," and the like were used to emphasize the point that key portions of the video disproving Giuliani's assertion of fraudulent ballots had not been shown to the legislature or tweeted to the public. Those descriptors were figurative, not literal, and under well-established law, not actionable. *Horsley*, 292 F.3d at 701-02 & n.2; *Bryant*, 311 Ga. App. at 243.[10]

Plaintiff's second contention, that two "suitcases" references in the book falsely defamed her, is also meritless. Whether or not, as plaintiff claims, it was common for Fulton County election officials and others to colloquially refer to ballot containers as "suitcases," it cannot be denied that Giuliani and others, including the president himself, were using the term to falsely assert that the boxes

---

[10] It should be noted that some of the adjectives that the complaint quotes and attributes to *Integrity Counts*—e.g., "spliced," Am. Compl. ¶ 4—would be likewise non-actionable but nowhere appear in the book.

were not official and the ballots within them fraudulent. *See, e.g.*, Ex. 1 at 168-69 (Trump: "[t]hey weren't in an official voter box; they were in what looked to be suitcases or trunks. Suitcases."). The statements plaintiff challenges—an investigative reporter's 'not suitcases' tweet and Gabriel Sterling's 'secret suitcase' discussion—were countering these assertions and, as the critical omitted segment of the State Farm video makes clear, were plainly correct and accurate in doing so. Plaintiff was not defamed by the statements nor were they in any way false.

Finally, with respect to plaintiff's overall contention, that *Integrity Counts* somehow singled her out, which it did not, and specifically accused her, which it did not, of having presented misleading evidence to the Georgia legislature, the fact is that she did present misleading evidence to the Georgia legislature. Her presentation distorted affidavits and played a videotape to raise suspicions about the "chain of custody" of "suitcases of ballots" that goes to "fraud or misrepresentation" that other portions of the videotape that she did not play showed to be baseless. *See* pages 4-7, *supra*. Plaintiff did not go so far as Giuliani in claiming that her presentation conclusively established the existence of criminal fraud, but it was her presentation and its critical omission that served to justify and propagate the claim.

*Integrity Counts* accused Giuliani, not plaintiff, of "intentionally mis[leading] our senators." Ex. 1 at 139. But had it accused plaintiff, it is clear,

given this context, that the accusation would have to be considered either

substantially true as a matter of fact or at the very least a protected statement of

opinion. *See, e.g., Webster v. Wilkins*, 217 Ga. App. 194 (1995) (calling a parent

"unfit to have a kid" was not a statement of fact but an expression of opinion

concerning a matter on which reasonable people might differ). Either way, the

plaintiff has not and cannot plausibly point to facts establishing actionable falsity.

## The Complaint Does Not Plausibly Allege Actual Malice

Plaintiff must also plausibly allege proof of publication with the requisite

degree of *fault*. In this case, there is no doubt, and the complaint concedes as much,

that plaintiff is a public figure with respect to the 2020 Georgia presidential

election controversy and, as such, the requisite level of fault she must prove is

what *New York Times v. Sullivan* and its progeny labelled "actual malice." *Gertz v.*

*Robert Welch*, 418 U.S. 323, 334 (1974); *Sullivan*, 376 U.S. at 279-80. *E.g.*,

*Michel*, 816 F.3d at 701-02 (affirming dismissal for failure to adequately plead

actual malice).

Here, given that she is not named or specifically referenced in the challenged

statements, the "actual malice" requirement means that plaintiff must plausibly

allege that she will be able to show, by clear and convincing evidence, not only

that Secretary Raffensperger "in fact entertained serious doubts as to the truth" of

the challenged statements—which she cannot as the statements are true—but also

that he himself personally intended the statements to be understood as being about her. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). *See, e.g., Coral Ridge*, 6 F.4th at 1252-53 (complaint must present "factual allegations that would allow us to infer that [defendant]'s subjective state of mind was sufficiently culpable"; conclusory assertions insufficient). *See generally Howard v. Antilla*, 294 F.3d 244, 254 (1st Cir. 2002) (actual malice standard does not permit liability based on mere allegation that a defamatory implication "should" have been foreseen by defendant); *Dodds v. American Broadcasting Co.*, 145 F.3d 1053, 1063-64 (9th Cir. 1998) (same); *Newton v. National Broadcasting Co.*, 930 F.2d 662, 681-82 (9th Cir. 1990) (same).

The complaint does not come close to clearing this bar. Nowhere in the complaint—neither in its six conclusory paragraphs directed to actual malice, Am. Compl. ¶¶ 138-143, nor elsewhere—does plaintiff offer any plausible explanation, nor can she, as to why on earth Secretary Raffensperger, if he intended to make the challenged statements about plaintiff would do so by publishing them in a book that not only does not name or otherwise identify her but that also repeatedly identifies her video presentation excerpts as Giuliani's. The only plausible explanation—particularly given Secretary Raffensperger's declaration in the Texas action that he was not familiar with plaintiff, *see* Ex. 3—is that Secretary Raffensperger had no such intent.

**The Complaint Also Fails to State a Claim for False Light**

Plaintiff also makes a futile attempt to assert a claim for false light invasion of privacy. Am. Compl. at 1, ¶¶ 187-88. In Georgia, false light claims are subject to a one-year statute of limitations. O.C.G.A. § 9-3-33; *Davis v. Emmis Publ'g Corp.*, 244 Ga. App. 795, 796–97 (2000). *Integrity Counts* was published in November 2021, Am. Compl. ¶ 23, and plaintiff did not first assert the claim until April 2024—over two years later—when she filed suit in Georgia. Compl. at 1, 51. Therefore, the claim is time barred.[11] In addition, the claim is not otherwise legally viable. *See, e.g.*, *Bollea v. World Championship Wrestling, Inc.*, 271 Ga. App. 555, 556 n.1 (2005) (parallel defamation and false light claims cannot co-exist); *Smith v. Stewart*, 291 Ga. App. 86, 100 (2008) (same).

## <u>CONCLUSION</u>

Plaintiff's lawsuit is as baseless and shameless as the Giuliani fraudulent ballots claim to which it relates. It should be dismissed with prejudice.

---

[11] Because the claim was not part of plaintiff's Texas complaint, *see* Ex. 2, the Georgia renewal statute is inapplicable. *Blier v. Greene*, 263 Ga. App. 35, 38 (2003) (to suspend the running of the statute of limitation in a renewal action, the cause of action must be substantially the same as in the original action; a plaintiff may not add otherwise barred claims).

Dated: August 13, 2024                  Respectfully submitted,

                                        */s/ Peter Canfield*
                                        —————————————————

                                        Peter Canfield
                                        Ga. Bar No. 107748
                                        CANFIELD LAW LLC
                                        34 Inman Circle NE
                                        Atlanta, Georgia 30309
                                        Telephone: 1.678.296.5413

                                        Eliyahu E. Wolfe
                                        Ga. Bar No. 776278
                                        WOLFE LAW, LLC
                                        1201 W. Peachtree St., Ste. 2300
                                        Atlanta, GA 30309
                                        Telephone: 1.404.963.0013

                                        C. Ryan Germany
                                        Ga. Bar No. 500691
                                        GILBERT HARRELL SUMERFORD &
                                        MARTIN, P.C.
                                        675 Ponce de Leon Ave. NE, Suite 8500
                                        Atlanta, GA 30308
                                        Telephone: 1.678.672.9230

                                        Amber Carter
                                        Ga. Bar No. 631649
                                        GILBERT HARRELL SUMERFORD &
                                        MARTIN, P.C.
                                        777 Gloucester St., Suite 200
                                        Brunswick, GA 31520
                                        Telephone: 1.912.265.6700

                                        *Counsel for Defendant*

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies, pursuant to Local Rule 5.1(C), that this document has been prepared in Times New Roman, 14 point, as approved by the Court.


Dated: August 13, 2024                    */s/ Peter Canfield*

                                          Peter Canfield
                                          *Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Local Rule 5.1, I hereby certify that on this day I electronically filed the above MOTION TO DISMISS AMENDED COMPLAINT AND INCORPORATED MEMORANDUM IN SUPPORT with the Clerk of Court using the CM/ECF system which will automatically send e-mail notifications of such filing to all attorneys of record.


Dated: August 13, 2024

*/s/ Peter Canfield*
Peter C. Canfield
*Counsel for Defendant*